**In re Judge Joseph B. BROWN, Jr., Appellant.**

Supreme Court of Tennessee, at Nashville.

June 13, 1994.

Wayne Emmons, Randall B. Tolley, W. Otis Higgs, Jr., Memphis, for Judge Brown.

William H. Inman, Senior Judge, Knoxville, for the Court of the Judiciary.

## OPINION

REID, Chief Justice.

This case presents an appeal from the judgment of the Court of the Judiciary that the appellant, Joseph B. Brown, Jr., Judge of the Criminal Court of Shelby County, violated Canons 2A and 3A(3) of the Code of Judicial Conduct, T.C.A. § 17–5–302(3), (8). The Court of the Judiciary, with five of the eleven participating judges dissenting, found that certain statements made by the appellant in open court regarding the Juvenile Court of Memphis and Shelby County constituted a violation of the Code, and the court unanimously found that the appellant's delay in responding to the proceedings against him in the Court of the Judiciary was a violation of the Code. The Court of the Judiciary imposed a public reprimand on each viola-

tion. The record does not support the judgment of the Court of the Judiciary on the first issue; it does support the Court's finding on the second issue.

This proceeding had its commencement with a letter written by the chief staff attorney of the Juvenile Court of Memphis and Shelby County to the presiding judge of the Court of the Judiciary. The letter reported to the Court of the Judiciary statements made by the appellant during the course of hearings in his court on petitions for *habeas corpus* filed by certain persons who had been incarcerated upon orders of the juvenile court for failure to make child support payments ordered by that court. The basis for relief claimed by the incarcerated petitioners was that the procedure followed by the Juvenile Court, including that authorized by the Juvenile Court Referee Act, T.C.A. § 37–1–107, was unconstitutional.

The Juvenile Court of Memphis and Shelby County was created by private act in 1967. 1967 Tenn.Priv.Acts, Ch. 219. The act provides that "the person who holds the position of Judge of the Memphis Municipal Juvenile Court at the time that the act shall become operative ... shall become the judge *of the Juvenile Court of Memphis and Shelby County*" to serve until the next county election. Ch. 219, § 6. According to the act, the judge would then be elected for an eight year term. The act did not require that the judge be a lawyer. Judge Kenneth A. Turner, who is not a lawyer, but who held the position of judge of the Memphis Municipal Juvenile Court at the time that the act became effective, became the judge of the Juvenile Court of Memphis and Shelby County in 1967 and continues to hold that position.[1] Judge Turner has at least five referees who, in addition to other duties, hear cases in which imprisonment may be imposed as punishment. *See Anglin v. Mitchell,* 596 S.W.2d 779 (Tenn. 1980) (a non-lawyer juvenile court judge is prohibited by due process from confining or otherwise depriving a defendant of his liberty); *see generally, State v. York,* 615 S.W.2d 154 (Tenn.1981); T.C.A. § 17–1–106. The

referees who work under Judge Turner's direction, like all juvenile court referees, are required to be lawyers. T.C.A. § 37–1–107.

The Canons found by the Court of the Judiciary to have been violated provide as follows:

2A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

3A(3). A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

The statements made by the appellant and found by the Court of the Judiciary to constitute a violation of Sections 2A and 3A(3) of the Code, and the context in which they were made, are as follows (the offending statements are underlined):

I'm just very interested in why, after twenty-seven years, somebody down the street doesn't get the idea that the law of the United States of America doesn't apply to that place. And I hope when somebody addresses this factual matter, we get this point—there's a war that just got through getting fought over in the Middle East because we have a tyrant who exercises exclusive powers and control.

In the United States of America, not a single citizen is supposed to be subjected to somebody who exercises an executive function and a judicial function. I am very concerned with, and I want us to get around to that, and we will move on these matters very quickly. Twenty-seven years is long enough for somebody to get their act together down there.

In the United States of America, a citizen of that country, of the State of Tennessee, in the County of Shelby, in the City of Memphis, is not supposed to have the same man charge him, arrest him, and try

---

1. Section 20 of the act also authorizes a second judgeship for the juvenile court, but requires that this second judge be "learned in the law and licensed to practice law...." 1967 Tenn. Priv.Acts, Ch. 219.

him, or the agents of the same man. That's un-American, and that's not suppose to exist.

I hope somebody is going to get that in context, because if it doesn't get straightened out down there, it will get straightened out from here.

\*   \*   \*   \*   \*   \*

Now, God in heaven, this thing has been kicking around here for several months, waiting for this hearing, and then I get this thing together and nobody down there acts like they've heard of the law.

Now, somebody, somewhere, please, let's get to the meat of this so we can deal with bringing Shelby County, Tennessee, as it applies to juveniles, into the Twentieth Century, almost to the twenty-first.

Now, I'm getting a little sick and tired—I just got through looking at two disgraceful reports here on individuals who have been run through juvenile court, as I see everyday, and every assistant general and every public defender and defense lawyer, sees on a daily basis, as a thing where it acts like juvenile court does not need to have the title "juvenile" in it because it doesn't deal with juveniles.

Most of the business down there is child support, which is supposed to be something that circuit court could handle around here most of the time, that the attorney generals could handle around here most of the time.

They want to choose their business dealing with this political situation in collecting massive sums of money, which is good; the Court does not disapprove of the efforts of seeing the people support their children, but we do have some juveniles in this county that are in desperate need of some attention.

Maybe we wouldn't have this mess here if juvenile court would act like a juvenile court and deal with some juvenile matters.

We've got a massive crime wave, a breakdown of law and order in this county, massive violence by youths in the inner-city of this county, and we don't have any attention devoted to it.

These statements were made by the appellant in the *habeas corpus* proceeding in the criminal court on March 8, 1991. Additional hearings were held on December 20, 1990, June 24, 1991, June 28, 1991, July 1, 1991, October 25, 1991, January 7, 1992, and January 16, 1992. As the cases progressed, additional petitioners were added as parties so that by January, 1992, there were twenty-two individual petitioners seeking *habeas corpus* relief in the appellant's court for their incarceration as a result of alleged failures to pay child support.

The Court of the Judiciary found seven additional statements to constitute a violation of Sections 2A and 3A(3) of the Code. These statements, all made during a hearing on July 1, 1991, appear, in context, underlined as follows:

> [Judge Brown]: I believe in doing justice. I don't care whose feet I trample on in the process, but you gentlemen are obstructing this process. I have looked at that with these files. I remarked Friday—you weren't here—about this thing when you had all of these witnesses, that we had three hours worth of obstruction to keep from getting brought in here that you were trying to quash subpoenas on.
>
> Now let's get this out of the way. This Juvenile Court deals with a lot of business around here. Some of it, I'm sure, they deal with it appropriately, but we have got citizens in this county that range from congressmen to policemen to ordiary (sic) Joe Blow working a blue collar job to somebody down and out on the streets that's subject to what goes on down there because they may or may not have been involved in an illegitimate situation or a divorce action at one time or the other.
>
> Now I'm very jealous of the fact that I have gotten a law degree, that I struggled through and passed that bar exam, and then I practiced law for eighteen years, and I went out and campaigned very hard three times to get elected. I'm very proud of the sensitivity that I've developed toward what goes on with the citizens in this county. And I have always been a person in my practice of law that has not given a

damn about what anybody thinks. If I believe right is to be done, I'll go do it. Now I'm going to put a foot deep up somebody's behind if we don't get this thing turned around and corrected the way it is supposed to be done because that process down there is disgusting to a trained lawyer who practices criminal law. I don't care whether you're a prosecutor or defense counsel. Everybody in this county, just off the cuff, has got a funny feeling about that.

We have—and I'm just setting the parameters. We have got women who are on welfare, women who are down and out, who just love the fact that their man is drug through there and required to pay child support. I have no problems with somebody being made to pay child support who is supposed to. I order it from the bench as part of a probation order from time to time.

But we have other people, and people who aren't in that category but who ought to be, who are concerned about the appearance of impropriety that attaches down the street there.

Now I don't know why it is. I have not been able to understand why every other court in this county, though from time to time they do stray, has been rather scrupulous, and this is in terms of my having practiced in Arkansas, Mississippi, being from California and seen it out there, been to D.C., watched it there. They are pretty scrupulous about dealing with people's rights around here, except one place.

\* \* \* \* \* \*

Now, sooner or later, that act has got to get cleaned up. You have got two judgeships authorized since 1967. The taxpayers are paying out a half-million dollars a year because the regular judge is infirm as far as hearing cases. You could have had another real live judge down there instead of an honorary one for the last twenty-four years, and we would have been saved a half-million dollars a year. You got five referees paid sixty-two thousand-plus dollars a year, a special judge paid sixty-eight thousand dollars-plus a year, plus insurance benefits, plus health, plus retirement

benefits. You've got a half-million bucks down there because you got an honorary judge who is too busy to sign his orders, who can't hear a case.

Now I'm jealous of the fact that I'm a member of the bar of the State of Tennessee. I'm jealous of the fact that I busted my behind getting through law school and going through studying for the bar. I'm jealous of the fact on behalf of every other licensed attorney in this state of this august society that we constitute.

Now, you as a learned attorney, you sitting next to you, you, you, and you have gone through that. You are part of this initiated body. And for too long in this county we have been haggling around, backwards and forwards, upside down, because we have a non-attorney in here that is fouling up the works by some garbage that has no business coming out of a court of law.

Now I know you got hired. You're an able counsel. You got hired. What I'm here for, and I'm tired of messing with this, I want everybody to sit down. We plot here. We get around the fact that we don't have a real live judge down at that place, and see what we can do to protect the citizens from the mess they got into by grandfathering somebody down there to play honorary judge.

Now, report that back, I don't care. Transcribe that. I'm disgusted.

Now I'm going to walk out of here and I'm going to take a half hour recess. Let's quit shucking and jiving and get together and see where we stand on this, so we can get some justice for these citizens in this county. There are some people that need to pay child support. Let's go after them. There are some juveniles that need to be dealt with. Let's go after them. There is a right way and a wrong way to do it.

\* \* \* \* \* \*

Now let's sit here with this expertise and these excellent advocates and get something together as lawyers and get this entered, and go down there and give some guidance to this person who is masquerading as a judge down there. And I'm put-

ting it exactly as that because I am jealous of this.

If you ain't got no law license, you ain't really got no business presiding down there. And that's exactly what the situation is.

No comment, please.

So let's get this together. You sit here, you learned gentlemen in the law, fine practitioners all, put this legal skill together, and draft up something for the guidance of this person with the infirmity down there, so we can stumble along, paying another half million a year because he is an honorary judge, and we don't get what we're supposed to get but we'll get what we can get out of this.

The response of the appellant to the complaint filed against him by the chief staff attorney for the Juvenile Court essentially repeated the criticisms of the structure and operation of the Juvenile Court, that the *habeas corpus* proceedings showed "a developing pattern and practice of deliberate delay and avoidance which suggested that the respondent Juvenile Court and its judge were attempting to forestall review of their operations and the exposure of non-compliance with constitutional mandates sufficiently serious as to prove potentially fatal to the operations of Juvenile Court." The response repeated criticisms regarding the proceedings in Juvenile Court in which lawyers were engaged by a non-lawyer judge to perform judicial functions that could be performed only by persons licensed to practice law, and the necessity for a "special judge" to be elected each court day because of the non-lawyer judge's "educational and professional infirmities." The appellant expressed in the response the belief that his criticisms were accurate, justified and appropriate.

The appellant insists that his statements are protected by the free speech provisions of the First Amendment of the United States Constitution and Article I, Section 9 of the Tennessee Constitution. However, that issue is reached only if there is a finding that the judge's conduct violated the Code.

In finding that the Code has been violated by the statements set forth above, the Court of the Judiciary did not consider the two sections of the Code separately. It appears that the main reliance was on Canon 2A rather than 3A(3). The latter section is directed at a judge's conduct towards litigants, jurors, witnesses and lawyers and "others with whom he deals in his official capacity." That Canon, though not expressly limited, obviously relates principally to the judge's conduct in court where he deals with litigants, jurors, witnesses, lawyers and others. Since the conduct found to be in violation of the Code in this case did not relate to any person with whom the judge had direct contact, it appears that the Court of the Judiciary relied principally on Canon 2A, which pertains to conduct which would affect the public's confidence in the judiciary. Canon 2A mandates conduct that promotes public confidence in the integrity and impartiality of the judiciary, and, stated conversely, prohibits conduct that tends to impair public confidence in the judiciary. The official commentary to Canon 2A condemns "irresponsible" and "improper" conduct and "impropriety" and the "appearance of impropriety."

The Court of the Judiciary found that the appellant made statements "critical of Judge Kenneth Turner as judge of the Juvenile Court of Shelby County," and that "derogatory comments from the bench about [a judge's] colleagues" may constitute willful misconduct prohibited by Canon 2A. This principle is supported by the authorities relied upon by the Court of the Judiciary. *See Scott v. Flowers,* 910 F.2d 201 (5th Cir.1990); *Gonzalez v. Commission on Judicial Performance,* 33 Cal.3d 359, 188 Cal.Rptr. 880, 657 P.2d 372 (1983); *see generally, Sarisohn v. Appellate Div., Second Dept., S.Ct. of New York,* 265 F.Supp. 455 (E.D.N.Y.1967); *In re Broome,* 245 Ga. 227, 264 S.E.2d 656 (1980); *McCartney v. Commission on Judicial Qualifications,* 12 Cal.3d 512, 116 Cal.Rptr. 260, 526 P.2d 268 (1974). However, under the facts of this case, the issue is not the extent to which a judge may gratuitously make derogatory remarks about another judge but, rather, the extent to which a judge may criticize or even malign a decision or procedure that is properly the subject of judicial review, even though the statements may go beyond the precise legal and factual issues of

the case and may reflect unfavorably upon the judge whose action is the subject of review.

The nine statements found sanctionable by the Court of the Judiciary must be evaluated in light of the context in which they were made. The *habeas corpus* proceedings before the appellant were conducted over a one-year period. The transcript of the eight separate hearings totals nearly 500 pages. The transcript shows that the appellant was critical of the "appalling" state of the Juvenile Court's records, its use of a rubber stamp to sign orders, including those mandating incarceration, the Juvenile Court's failure or ineffectiveness in informing defendants of their constitutional rights, and what he perceived to be the Juvenile Court's practice of imposing indefinite incarceration on those who did not pay child support.

While much of the appellant's language was harsh and some remarks were crude, his statements were not directed at Judge Turner personally, except to the extent that the structure and procedures under review were made necessary by the fact that Judge Turner is not a lawyer. Viewed in context, the comments found offensive were directed at the perceived inadequacies and improprieties in the structure and operation of the Juvenile Court system, which are appropriate subjects for criticism. *See Scott v. Flowers,* 910 F.2d 201 (5th Cir.1990) (As an elected public official, it is not unexpected that a judge would be "willing to speak out against what he perceived to be serious defects in the administration of justice in his county."); Canon 7(A)(4) ("A judge should not take a public position on political issues except on behalf of measures to improve the law, the legal system, or the administration of justice" ). The procedures employed by the juvenile court were among the significant legal issues presented for resolution. The statements indicate, in addition to a concern with the administration of justice in the Juvenile Court, frustration with the apparent lack of cooperation by representatives of the Juvenile Court, which was the respondent in the *habeas corpus* proceedings.

■ The essential issue is whether the appellant's statements "promote public confi-

dence in the integrity and impartiality of the judiciary." Canon 2A. The comments made by the appellant obviously do not promote public confidence in the Juvenile Court of Memphis and Shelby County. Indeed, those statements could cause great concern regarding the fairness, efficiency, and even the lawfulness of that court. However, the canon does not focus on a particular court, it address "the judiciary." The judiciary "pertain[s] or relat[es] to the courts of justice, to the judicial department of government, or to the administration of justice." *Black's Law Dictionary* 762 (5th ed. 1979). The judicial system recognizes that errors will be made and it provides means whereby decisions and procedures can be reviewed and errors corrected. Review, analysis and criticism are an essential part of the judicial process, and, even comments which reflect unfavorably upon one aspect of the judicial system may reasonably promote confidence in the system as a whole.

■ The statements found to erode confidence in the judiciary were made in open court during the course of formal proceedings, they were directed to counsel representing parties in the case, and they related primarily to matters relevant to the case before the court. A judge is not subject to discipline for an appropriate exercise of judicial discretion. *In re Elliston,* 789 S.W.2d 469, 475 (Mo.1990). Necessary judicial independence requires that a judge not be subject to discipline for good faith comments directed primarily and principally at issues properly before the court. Of course, utilizing a court proceeding as a bully pulpit from which to impose irresponsible and improper invectives upon colleagues or their professional performance would violate the code and subject the judge to discipline.

The appellant defends his choice of language on the ground that harsh language was necessary to cause the Juvenile Court to take corrective action. The proclaimed necessity appears only from the appellant's assertion. The comments were addressed to lawyers, and, traditionally, the language of the law, lawyers, and judges has been restrained, incisive, and civil. This Court is not persuaded that the appellant's language is

more effective. The use by judges of language that is lacking in civility could exacerbate the recent tendency of lawyers to be discourteous, combative, and rude. *See* "Towards a Renaissance of Professionalism in Trial Advocacy," 20 Tex.Tech.L.Rev. 787, 789 (1989). However, the wisdom of the statements notwithstanding, they do not, on this record, constitute a violation of the code.

 The other basis for finding that the appellant violated the Code was his delay in responding to the proceedings initiated in the Court of the Judiciary. The chief staff attorney for the Juvenile Court filed a complaint against the appellant on October 31, 1991. The presiding judge of the Court of the Judiciary, upon finding probable cause to believe that the appellant was guilty of a violation of the Code, sent a copy of the complaint to him on November 7, 1991, and requested a response, in accordance with T.C.A. § 17–5–304(a). The appellant did not respond. On March 9, 1992, Senior Judge William H. Inman, who had been appointed by the Court of the Judiciary to investigate the complaint, advised the appellant by letter that a sworn response to the complaint, as required by T.C.A. § 17–5–304, was expected. The appellant made no response. On May 26, 1992, the Court of the Judiciary issued a formal notice stating that there was probable cause to believe the appellant had violated the Code. The notice was served on the appellant; the appellant made no response. Seven months after the first notice had been given, a response to the complaint, dated June 9, 1992, was received by the Court of the Judiciary. The response made no reference to the delay in responding. At the hearing before the Court of the Judiciary, the appellant stated that he considered a response on his part optional. He added, apparently in extenuation, that at the time he had a "very, very heavy calendar." He admitted, however, that even though he had advised the presiding judge on January 9, 1992, that he would respond to the complaint "this week," he did not respond for another six months.

The appellant's cavalier attitude towards the proceeding against him in the Court of the Judiciary detracts from his avowed respect for the law and its processes. There is no language in T.C.A. § 17–5–304 or 307 on which a reasonable conclusion that a response was "optional" could be based. Indeed, T.C.A. § 17–5–304(a) makes a sworn statement mandatory as part of the investigation of the charges. Citizen litigants called upon to respond to charges are expected to abide by time constraints set out in statutes and court rules; no less is required of judges. The record supports the unanimous decision of the Court of the Judiciary that the appellant's delay in responding to the complaint was a willful violation of the Code.

The judgment of the Court of the Judiciary finding the appellant's statements to constitute a violation of the Code is reversed; the judgment of the Court of the Judiciary finding the appellant's delay in responding to the complaint constitutes a violation of the Code and imposing a public reprimand is affirmed.

Costs are assessed against the appellant.

DROWOTA, O'BRIEN, ANDERSON and BIRCH, JJ., concur.