# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### May 11, 2011 Session Heard at Knoxville

# IN RE: THE HONORABLE JOHN A. BELL, JUDGE, GENERAL SESSIONS COURT OF COCKE COUNTY, TENNESSEE

**Direct Appeal from the Court of the Judiciary**
**No. 08-3508**

---

**No. M2010-01447-SC-R3-CJ - Filed June 10, 2011**

---

In this direct appeal of a judicial disciplinary proceeding, we are asked to review the Court of the Judiciary's decision that Cocke County General Sessions Court Judge John A. Bell violated various canons of the Tennessee Code of Judicial Conduct, resulting in sanctions that included a ninety-day suspension. The Court of the Judiciary found that Judge Bell violated the Code by taking nine months to decide the complainant's personal injury action, re-hearing the case without disclosing to a new party that he had previously made findings against the new party as to liability and damages, and contacting through an attorney the self-represented complainant while the complainant's case was still pending before him in General Sessions Court. We affirm the code violations with respect to the delay and the ex parte communication and affirm the sanctions.

**Tenn. Code Ann. § 17-5-310(a) (2009) Appeal as of Right; Judgment of the Court of the Judiciary Affirmed in Part and Affirmed as to Sanctions**

CORNELIA A. CLARK, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

W. Gordon Ball and W. Allen McDonald, Knoxville, Tennessee, for the appellant, Judge John A. Bell.

Timothy R. Discenza, Memphis, Tennessee, and Patrick J. McHale, Nashville, Tennessee, for the appellee, Court of the Judiciary.

## OPINION

## BACKGROUND

John A. Bell was licensed to practice law in Tennessee in 1983 and has served as Cocke County General Sessions Judge since September of 1998. He was re-elected to his judicial office in 2006. This appeal arises out of a Complaint Against Judge Under Code of Judicial Conduct filed by David J. Pleau on July 14, 2008. After a full initial investigation, a three-judge investigative panel of the Court of the Judiciary found reasonable cause to believe that Judge Bell committed a judicial offense and directed disciplinary counsel to file formal charges against Judge Bell. See Tenn. Code Ann. § 17-5-304(d)(2)(A) (2009). The Court of the Judiciary heard the formal charges against Judge Bell on June 2-3, 2010. After deliberations, the court announced its decision on the record on June 3, 2010, and memorialized its decision in a written order filed on June 14, 2010. We take our recitation of the facts from the record of the proceedings before the Court of the Judiciary, including the exhibits admitted into evidence and the testimony offered at trial.

*Facts*

In December 2006, Pleau was involved in an automobile accident with Jo Ann Coleman, an uninsured motorist. On August 9, 2007, Pleau, acting pro se, filed a civil warrant in Cocke County General Sessions Court ("Pleau I"). The civil warrant named Merastar Insurance Company ("Merastar"), Pleau's uninsured motorist carrier, as a defendant, but did not name Coleman.

On September 18, 2007, Judge Bell heard Pleau I. After Pleau presented his case, Merastar's attorney submitted a written motion to dismiss. Merastar argued that Tennessee Code Annotated section 56-7-1206 (2008) required that Pleau first sue Coleman, the uninsured motorist, before he could name Merastar, his uninsured motorist carrier. At the end of the hearing, Judge Bell indicated that he would issue his decision in a week.

When no decision was rendered within a week's time, Merastar's counsel had his staff contact Judge Bell's office to check on the status of the case. On October 2, 2007, counsel emailed his client to report that Judge Bell's secretary "advised that [Judge Bell] has ruled but the Order has not yet been typed." Over the following months, Pleau and staff for Merastar's counsel each regularly inquired about the status of the case, receiving reassurances that Judge Bell was working on the case.

Judge Bell finally decided Pleau I on June 27, 2008, nine months after the trial. Judge Bell's order found that the "Other Driver" (Coleman) was 100% at fault and that Pleau's

vehicle had sustained $4,726.78 in damages. However, because Pleau had failed to name Coleman as a defendant pursuant to section 56-7-1206, Judge Bell dismissed the action against Merastar without prejudice.

Due to an apparent oversight by the General Sessions Court Clerk, neither Pleau nor Merastar's counsel timely received a copy of the judgment. Merastar's counsel learned that the judgment had been filed during one of his staff's periodic inquiries regarding the status of the case. Merastar's counsel obtained a copy of the judgment on request via a fax from the clerk's office, and, concerned that Pleau also might not have received the judgment, sent him a copy of the judgment by certified mail, return receipt requested, on July 9, 2008. When Pleau went to the clerk's office on July 10, 2008, with a copy of the judgment, he intended to appeal Judge Bell's decision, only to discover that the ten-day period for filing an appeal had expired. Therefore, on July 14, 2008, Pleau filed a complaint against Judge Bell with the Court of the Judiciary. The substance of the single-issue complaint was that Judge Bell did not decide Pleau's civil case in a timely manner and that, once the judgment was entered, Pleau did not receive notice of the judgment until after the time for appeal had expired.

Disciplinary counsel for the Court of the Judiciary sent Judge Bell a copy of Pleau's complaint and asked Judge Bell to respond to the complaint. On July 17, 2008, Judge Bell responded with a sworn affidavit, asserting that he had "done nothing wrong or improper" and then describing the "extensive legal research" he had undertaken concerning Merastar's motion. In addition to researching all state and federal statutory and case law associated with the language found in section 56-7-1206, Judge Bell also asserted that he had conducted nationwide research on whether Merastar's failure to raise its motion before trial amounted to a waiver. Furthermore, Judge Bell explained that he had disposed of more than 12,000 cases while Pleau I was under advisement and had been temporarily disabled by an automobile accident in April 2008. At trial, Judge Bell testified that a computer crash during the Christmas 2007 holiday also set him back in deciding Pleau I.

While disciplinary counsel continued to exchange correspondence with Judge Bell concerning the ethics complaint, Pleau filed a second civil warrant on October 8, 2008, again seeking damages for the December 2006 accident ("Pleau II").[1] The civil warrant in Pleau II named Coleman and subsequently Merastar as defendants.

On October 26, 2008, disciplinary counsel sent Judge Bell a letter notifying him that an investigative panel of the Court of the Judiciary had authorized a full investigation.

---

[1] Because Cocke County has only one General Sessions judge, this case automatically was under Judge Bell's authority.

Pursuant to statutory notice requirements, the letter informed Judge Bell of the identity of the complainant, the underlying factual allegations, the canons and rules allegedly violated, Judge Bell's duty to respond, and the opportunity to meet with disciplinary counsel. See Tenn. Code Ann. § 17-5-304(c)(1). The letter also stated, "This investigation can be expanded if appropriate."

On December 15, 2008, Judge Bell sent a letter to disciplinary counsel, stating that the clerk's office had mistakenly failed to notify the parties of the filing of the judgment. Judge Bell also stated that he would conduct a hearing with the Pleau I parties on December 23, 2008 to correct the mistake by the clerk's office. By letter to disciplinary counsel dated December 29, 2008, Judge Bell explained what transpired at the December 23 hearing. Judge Bell apologized for the delay in deciding Pleau I and for the clerk's office's failure to mail the order. He provided both Pleau and Merastar's counsel with a copy of the June 27, 2008 judgment "for formal service." He also acknowledged that Pleau had filed Pleau II, which was set for trial on February 20, 2009.[2]

Judge Bell testified that, about a week after the December 23, 2008 hearing, he received an anonymous telephone call indicating that Pleau did not want to pursue the complaint he had filed in the Court of the Judiciary. During the same time frame, in a letter dated January 9, 2009, disciplinary counsel offered to settle the complaint against Judge Bell by issuance of a public letter of reprimand and informed him that, if he did not accept the reprimand, formal charges would be filed against him. Judge Bell testified that, before he responded to disciplinary counsel's offer of a reprimand, he wanted to know Pleau's intent regarding the complaint.

Therefore, on February 2, 2009, Judge Bell approached Thomas J. Testerman, a local attorney, in the courthouse hallway and asked to meet with him in chambers. Judge Bell testified that he explained to Testerman that Pleau had filed two cases in General Sessions Court, one of which was still pending. He explained the nature of the ethical complaint filed against him. Judge Bell also explained to Testerman that disciplinary counsel had set a time frame for accepting the public reprimand and that Judge Bell had information that Pleau was not going to proceed with the judicial complaint. Judge Bell testified that he asked Testerman to represent him for the purpose of "find[ing] out simply whether or not Mr. Pleau was going to go forward with the [judicial] complaint." Testerman testified that the "gist" of the conversation was that Judge Bell believed it would not be appropriate for him to

---

[2] Judge Bell did not enter an order following the December 23, 2008 hearing. Coleman did not receive notice of the hearing and, therefore, did not attend. She was, however, subsequently given notice about the February 20, 2009 proceeding in Pleau II, and the transcript from that proceeding reflects that Coleman attended and participated.

contact Pleau directly, but he wanted Pleau to be contacted. Judge Bell paid Testerman $1 for this representation.

Judge Bell testified that he did not tell Testerman that it would be inappropriate for Judge Bell to contact Pleau himself. Instead, Judge Bell testified that he sought out Testerman because he did not want to be unrepresented in the judicial complaint. Judge Bell testified that he did not believe the phone call from Testerman to Pleau would qualify as an ex parte communication by Judge Bell because the call was focused exclusively on the issue of whether Pleau intended to proceed with the judicial complaint and would not involve any details pertaining to Pleau II.

Later in the day on February 2, 2009, Testerman called and reached Pleau at his home telephone number. Testerman and Pleau both testified that Testerman said he was calling because Judge Bell did not believe it would be appropriate to contact Pleau directly. Pleau indicated that he did not want to dismiss his judicial complaint against Judge Bell. Pleau testified that he told Testerman, "[M]y mind is on the civil suit right now and I don't want to be sidetracked into other issues." Testerman testified that, during the phone call, Pleau talked about the facts of the underlying accident, and Testerman participated in those discussions. After the phone conversation, Testerman contacted Judge Bell to report that Pleau would not withdraw his judicial complaint. Testerman and Judge Bell both testified that Testerman's representation of Judge Bell concluded once Testerman communicated Pleau's decision not to dismiss the judicial complaint.

Although the parties were cordial during the telephone conversation, Pleau testified negatively at trial before the Court of the Judiciary about the fact that Testerman had contacted him. According to Pleau's testimony, Testerman did not simply ask if Pleau intended to pursue his complaint against Judge Bell, but affirmatively requested that Pleau come to Testerman's office and sign paperwork dismissing the judicial complaint. Pleau testified that he "didn't like getting called by somebody telling me how to . . . run my life." Pleau further testified that Testerman's call "kind of irritated me because I really didn't think it was any of his business what I was doing."

By letter dated February 6, 2009, Judge Bell turned down the public reprimand offer, maintaining that he could not accept it in good conscience because he had not committed any ethical violation in deciding Pleau I. Judge Bell did not inform disciplinary counsel of the anonymous phone call or Testerman's conversation with Pleau on Judge Bell's behalf.

Before the start of the February 20, 2009 Pleau II hearing, Pleau spoke with David LaRue, a special investigator for the Court of the Judiciary whom disciplinary counsel had assigned to investigate Pleau's complaint. Pleau described to LaRue the details of

Testerman's phone call. After the hearing, LaRue accompanied Pleau to a local library, where Pleau prepared an affidavit that summarized his conversation with Testerman. LaRue and Pleau then went to a local attorney's office to have the affidavit notarized. Because he "felt like the information in the affidavit was significant enough," LaRue went immediately to the local district attorney's office and faxed the affidavit to disciplinary counsel.[3]

After several continuances, Judge Bell ultimately tried Pleau II on April 24, 2009. In the order entered on April 27, 2009, Judge Bell found that Coleman was 100% at fault and that Pleau's vehicle had sustained $4,726.78 in damages.[4] Both findings were identical to Judge Bell's findings in Pleau I. During the Pleau II proceedings, Judge Bell did not disclose to Coleman that he had previously heard testimony and made findings concerning the same accident in Pleau I. Nor did Judge Bell disclose to Coleman or Merastar that Testerman had communicated ex parte with Pleau on Judge Bell's behalf concerning the complaint Pleau filed with the Court of the Judiciary. Judge Bell testified that he did not believe that hearing the testimony in Pleau I disqualified him from hearing Pleau II because he had merely tried the case but did not have personal knowledge of the facts. He also testified that he did not disclose Testerman's contact with Pleau on his behalf because he thought the judicial complaint remained confidential prior to filing of formal charges and because he did not ask Testerman to communicate with Pleau about the Pleau II action.

*Charges and Findings of the Court of the Judiciary*

On October 13, 2009, disciplinary counsel filed formal charges against Judge Bell. The formal charges contained three counts, each alleging violations of multiple canons of the Tennessee Code of Judicial Conduct.[5] Count I alleged that Judge Bell failed to decide Pleau

---

[3] Consistent with Pleau's trial testimony, the affidavit states that Testerman called Pleau on Judge Bell's behalf, began the conversation by saying that Judge Bell realized it would be inappropriate to call Pleau directly, and asked Pleau to come to Testerman's office to sign dismissal paperwork. During the conversation, Pleau informed Testerman that he would not dismiss any pending action because he was focused on the upcoming civil suit.

LaRue later arranged a meeting in Sevierville between Pleau and representatives of the Attorney General's Office and Tennessee Bureau of Investigation. At the direction of law enforcement, Pleau called Testerman's office and made an appointment to meet about dismissing the judicial complaint. During the meeting, Pleau asked repeatedly if dismissing the complaint would be to his advantage in Pleau II, and Testerman consistently responded that it would not affect the outcome one way or the other.

[4] Merastar appealed Judge Bell's decision in Pleau II and ultimately settled the case for $500.

[5] After filing the formal charges, disciplinary counsel later filed a motion to amend on February 10,
(continued...)

-6-

I promptly because his decision came "some nine months after the presentation of the proof and the clear mandate of the law requiring a dismissal of the complaint." Count II alleged that Judge Bell, having already opined on liability and damages associated with the underlying automobile accident in Pleau I, was prejudiced against Coleman and required to disqualify himself from hearing Pleau II. Count III alleged that, while Pleau II was pending in his General Sessions Court, Judge Bell had initiated a prohibited ex parte communication by having Testerman contact Pleau about dismissing the complaint Pleau had filed in the Court of the Judiciary.

On June 2-3, 2010, an eight-member panel of the Court of the Judiciary heard the complaint against Judge Bell.[6] By written order filed June 14, 2010, the Court of the Judiciary issued its findings of fact and conclusions of law. As to Count I, the Court of the Judiciary found a violation of Canon 3(B)(8) of the Tennessee Code of Judicial Conduct.[7] Noting the admission that Judge Bell decided Pleau I nine months after its hearing, the Court of the Judiciary found that Judge Bell's testimony concerning the reasons for his delay was "not credible."

As to Count II, the Court of the Judiciary found a violation of Canon 3(E)(1).[8] In addition to the rule itself, the court quoted an excerpt from the canon commentary stating that "[a] judge should disclose on the record information that the judge believes the parties or

_____

[5](...continued)
2010. By order dated May 14, 2010, the Court of the Judiciary granted the motion as to certain factual allegations but denied as to additional charges that disciplinary counsel had not first presented to the investigative panel. See Ct. of the Judiciary R. 6, § 3(b)-(c). In its order on the motion to amend, the Court of the Judiciary also struck sua sponte those allegations in the formal charges that Judge Bell had violated provisions outside of the Tennessee Code of Judicial Conduct, including various criminal statutes.

[6] Circuit Court Judge Don Ash, presiding judge of the Court of the Judiciary, presided over the hearing. The other members of the panel were Criminal Court Judge Chris Craft; Municipal Judge Joe Fowlkes; Richard Manahan, a lay member; Circuit Court Judge Jean Stanley; attorney Paul DeHoff; Court of Appeals Judge D. Michael Swiney; and General Sessions Judge David Loughry.

[7] Tennessee Supreme Court Rule 10, Canon 3(B)(8) provides: "A judge shall dispose of all judicial matters promptly, efficiently, and fairly."

[8] Canon 3(E)(1) states, in pertinent part:

A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." The Court of the Judiciary found that Judge Bell violated this canon by (1) failing to disclose to Coleman that he had previously tried the case in Pleau I and found her to be 100% at fault for the accident and (2) failing to disclose to Coleman or Merastar that he had communicated with Pleau through Testerman about the complaint pending before the Court of the Judiciary.

As to Count III, the Court of the Judiciary found a violation of Canons 2(A) and 3(B)(7),[9] finding that Pleau's litigation in General Sessions Court "was so entwined with the complaint filed by Mr. Pleau" before the Court of the Judiciary that Judge Bell's contacting Pleau through Testerman amounted to an ethical violation.

In determining the appropriate sanction, the Court of the Judiciary considered the factors set forth in Tennessee Code Annotated section 17-5-301(i) (2009) and found that the following factors applied: prior complaints about Judge Bell, including a prior warning for delay;[10] misconduct occurring both inside and outside the courtroom; no evidence of effort to change or modify conduct; misconduct occurring while acting in an official capacity; the failure to acknowledge the nature and impropriety of his actions; and the effect of his misconduct on the integrity of and respect for the judiciary. See id. § 17-5-301(i)(3)-(6), (8)-(9). The Court of the Judiciary suspended Judge Bell for ninety days without impairing his

---

[9] Canon 2(A) provides: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Canon 3(B)(7) provides that, except in enumerated circumstances, "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding." The Court of the Judiciary found the violation of Canon 3(B)(7) by a vote of five to three. The findings of Judge Bell's violations of other canons were unanimous.

Additionally, the Court of the Judiciary found that Judge Bell did not violate other canons set forth in the formal charges. We do not enumerate those canons because the findings of no violation are not at issue in this appeal.

[10] Prior to the proceedings at issue in this case, Judge Bell was involved in two other disciplinary proceedings before the Court of the Judiciary. On September 25, 2005, Judge Bell received a warning from an investigative panel for delay in a case tried in September 2001 and decided in January 2003. He had also been named in a formal complaint for allegations of misconduct involving his use of a private probation service that employed his brother-in-law. Disciplinary counsel and Judge Bell ultimately settled that complaint on September 23, 2008, with Judge Bell agreeing not to appoint or use a private probation service with an owner, director, agent or employee whose relationship to Judge Bell or his spouse would suggest nepotism or favoritism.

compensation,[11] required him to decide all future cases within thirty calendar days from the date of hearing, and ordered forty-two hours of judicial ethics training to be completed in 2010-12.

Pursuant to Tennessee Code Annotated section 17-5-310(a) (2009), Judge Bell appealed the Court of the Judiciary's decision to this Court as a matter of right.

<u>AUTHORITY TO DISCIPLINE JUDGES</u>

The Supreme Court of Tennessee is a "direct creature of the Constitution and constitutes the supreme judicial tribunal of the state." <u>Barger v. Brock</u>, 535 S.W.2d 337, 340 (Tenn. 1976). Accordingly, the Court has broad inherent authority over the Tennessee judicial system. <u>Belmont v. Bd. of Law Exam'rs</u>, 511 S.W.2d 461, 463 (Tenn. 1974) (quoting <u>Cantor v. Brading</u>, 494 S.W.2d 139, 142 (Tenn. Ct. App. 1973)). The General Assembly has recognized that this Court has "general supervisory control over all the inferior courts of the state," Tenn. Code Ann. § 16-3-501 (2009), and that this inherent, plenary power derives from the common law and not from the General Assembly. Tenn. Code Ann. §§ 16-3-502 to -503 (2009). In that role, the Supreme Court has the inherent power to adopt the ethics rules for judges and to determine how judges should be disciplined for violation of those rules. Tennessee Supreme Court Rule 10, the Code of Judicial Conduct, is the set of rules by which judicial conduct is to be determined. Cf. <u>Hughes v. Bd. of Prof'l Responsibility</u>, 259 S.W.3d 631, 640 (Tenn. 2008) (describing this Court's "duty to regulate the practice of law" and "ultimate disciplinary responsibility for violations of the rules governing our profession").

---

[11] Pursuant to article VI, section 7 of the Tennessee Constitution, a judge's compensation "shall not be increased or diminished during the time" the judge has been elected to serve. See Tenn. Code Ann. § 17-5-301(h) (2009) (explaining that no sanction imposed by the Court of the Judiciary may violate this constitutional provision). Judge Bell has already served the suspension.

In Tennessee, current disciplinary authority is vested in the Court of the Judiciary.[12] As we noted in In re Williams:

>        The Court of the Judiciary was created by the Legislature to investigate and determine charges of judicial misconduct. The legislation provides a process by which sanctions may be imposed and a process for implementation of Article VI of the Tennessee Constitution by providing a procedure for the removal of Judges from office. Tenn. Code Ann. § 17-5-[311 (2009)].

987 S.W.2d 837, 838 (Tenn. 1998). While the Supreme Court has the authority to create its own separate process for all judicial discipline short of impeachment, the current legislation dealing with discipline as it relates to the ultimate possibility of impeachment has, at least to date, been deemed by the Court sufficient to facilitate the Court's exercise of its inherent disciplinary authority over the lower courts.[13]

_____

[12] The other forty-nine states and the District of Columbia, like Tennessee, all have codified rules of judicial conduct and a judicial conduct commission to investigate judicial misconduct. See Links of Interest, American Bar Association Center for Professional Responsibility, http://www.americanbar.org/groups/professional_responsibility/resources/links_of_interest.html (last visited June 8, 2011) (links to judicial conduct rules); Commission Membership, American Judicature Society, http://www.ajs.org/ethics/pdfs/Commissionmembership.pdf (last updated March 2007) (listing names and composition of judicial conduct commissions) ("Commission Membership"). The commissions in all but three states have at least one judicial member who is elected or appointed by other judges or is entitled to a position on the commission by virtue of holding a particular judicial office. See Commission Membership, supra.

[13] Tennessee Constitution article II, section 2 prohibits one branch of government from exercising powers properly belonging to another branch. However, the Constitution of Tennessee does not prohibit the three branches of government from cooperating with each other. As this Court noted over fifty years ago, "[t]he public welfare demands cooperation between the legislative and judicial branches of our Government, and an avoidance of unnecessary controversies between them." Petition for Rule of Court Activating, Integrating & Unifying the State Bar of Tenn., 282 S.W.2d 782, 787 (1955).

Consistent with the Constitution, the General Assembly may enact statutes that aid the Court in the exercise of its inherent supervisory power. Belmont, 511 S.W.2d at 464. However, the General Assembly may not enact statutes that frustrate or are in direct conflict with the Court's exercise of its powers. The creation of the Court of the Judiciary in 1979 is an example of inter-branch cooperation. See 1987 Op. Tenn. Atty. Gen. No. 87-02. It provided a single mechanism, acceptable to the Court, that facilitated the Court's exercise of its supervisory authority over the lower courts and, at the same time, facilitated the General Assembly's exercise of its authority over impeachment and removal.

In the case of In re Murphy, 726 S.W.2d 509 (Tenn. 1987), we confronted the argument that the legislation creating the Court of the Judiciary unconstitutionally permitted the Court of the Judiciary, rather
(continued...)

STANDARD OF REVIEW

Disciplinary counsel must establish charges of misconduct by clear and convincing evidence. Tenn. Code Ann. § 17-5-308(d) (2009). We review the Court of the Judiciary's findings and conclusions de novo on the record made before that court. Tenn. Code Ann. § 17-5-310(b)(1); see In re Williams, 987 S.W.2d at 841. No presumption of correctness attaches to the Court of the Judiciary's findings or judgment. Tenn. Code Ann. § 17-5-310(b)(1).

In conducting our de novo review of the Court of the Judiciary's decision in this case, we first determine whether clear and convincing evidence establishes Judge Bell's violation of the various canons of the Tennessee Code of Judicial Conduct. We then go on to review de novo the appropriateness of the sanction.

ANALYSIS

*Count I*

As to Count I, we agree with the Court of the Judiciary that Judge Bell's delay in deciding Pleau I violated Canon 3(B)(8) of the Tennessee Code of Judicial Conduct. Judge Bell cited a number of reasons for his delay. He asserted that he was required to do significant research on the underlying legal issues, that his heavy general sessions and juvenile court dockets prevented him from having time to research, that he had a computer failure in December 2007, and that, as a result of an April 2008 accident in which he was struck by a drunk driver, he was incapacitated for a period of time. The Court of the Judiciary specifically found Judge Bell's testimony concerning those reasons to be "not credible." We recognize that the Court of the Judiciary stands "in a better position to determine credibility issues and resolve conflicts in the evidence because it had the benefit of hearing the testimony and observing the demeanor of the witnesses firsthand." In re Williams, 987 S.W.2d at 841. Merastar's motion presented a straightforward question of law: whether Tennessee Code Annotated section 56-7-1206 precluded Pleau from suing Merastar without first naming Coleman as a defendant. Judge Bell initially told the parties

---

[13](...continued)
than the General Assembly itself, to recommend the removal of judges. There, a General Sessions Court judge facing a recommendation of removal from office argued that, since only the General Assembly could remove judges, the statutes empowering the Court of the Judiciary to investigate and recommend removal of judges violated the principle of separation of powers. Id. at 511. This Court disagreed, reasoning that the Constitution did not impose the duty of investigating or monitoring judicial conduct on the General Assembly and the General Assembly had the authority to enact legislation implementing its performance of its constitutional obligations in cooperation with the other two branches of government. Id. at 512-13.

that he would rule within a week of the hearing and responded to subsequent inquiries by promising a decision within similar periods of time. Indeed, about two weeks after the hearing, Judge Bell's secretary communicated to Merastar's counsel that Judge Bell had "ruled" but was still getting the order typed. The computer issue occurred more than three months after the case was heard. The accident involving Judge Bell did not occur until seven months after the hearing. In taking nine months to decide Pleau I without offering a credible explanation for his delay, clear and convincing evidence establishes that Judge Bell failed to decide the matter "promptly" and "efficiently," as Canon 3(B)(8) requires. Cf. Tenn. Sup. Ct. R. 11, § III(c) (limiting period for holding cases under advisement to no more than sixty days and for holding motions under advisement to no more than thirty days, "absent the most compelling of reasons").

We disagree with Judge Bell's contention that a single instance of delay is insufficient, as a matter of Tennessee law, to make out a violation of Canon 3(B)(8). Judge Bell points to Tennessee Code Annotated section 17-5-302(7) (2009), which states that the Court of the Judiciary may take cognizance of "[a] persistent pattern of delay in disposing of pending litigation." However, per subsection (3) of the same provision, the Court of the Judiciary may also address "[v]iolation of the code of judicial conduct as set out in Tenn. Sup. Ct. R. 10." Disciplinary counsel formally charged Count I as a violation of Canon 3(B)(8), rather than section 17-5-302(7). Nothing in the canon's language requires delay in more than one matter to establish that a judge has failed to "dispose of all judicial matters promptly, efficiently, and fairly." Because Canon 3(B)(8) does not require a "pattern" of delay, we do not need to decide whether Judge Bell's prior reprimand for delay and the current case make out a pattern.

*Notice*

Before we review the substance of the remaining counts, we consider Judge Bell's argument that we must dismiss those counts because disciplinary counsel failed to provide the required statutory notice as to those counts. In this case, the original notice dated October 26, 2008, advised Judge Bell that disciplinary counsel would investigate the single issue of Judge Bell's delay in deciding Pleau I and the parties' failure to receive the judgment until the time for appeal had expired. Indeed, at the time disciplinary counsel provided this notice, the other instances of alleged misconduct had not yet taken place. Our review of the record indicates that Judge Bell did not receive written notice of the other two counts until disciplinary counsel filed the formal charges on October 13, 2009.

The relevant statute directs disciplinary counsel, within thirty days of the investigative panel's authorization of a full investigation, to provide the judge by certified mail with "[a] specific statement of the allegations being investigated and the canons or rules being

investigated and the canons or rules allegedly violated, with the provision that the investigation can be expanded if appropriate." Tenn. Code Ann. § 17-5-304(c)(1)(A). The October 26, 2008 notice in this case complied with the statute because it identified the factual allegations under investigation, cited the canons allegedly violated, and stated the investigation could be expanded, if appropriate. Here, disciplinary counsel expanded the investigation because counsel learned of additional allegations of misconduct that took place after counsel provided the initial notice. We do not interpret section 17-5-304(c) to prevent disciplinary counsel from investigating and formally charging additional violations arising from conduct taking place after disciplinary counsel provided the statutorily required notice. The formal charges provide adequate notice of the additional charges. Therefore, we decline to dismiss Counts II and III on notice grounds.

*Count II*

The Court of the Judiciary's findings on Count II differ somewhat different from what disciplinary counsel alleged in the formal charges. In the formal charges, Count II was based on Judge Bell's alleged prejudice against Coleman in Pleau II because he had already decided fault and damages against her in Pleau I. The Court of the Judiciary's findings on Count II concluded that Judge Bell should have disqualified himself from Pleau II because of (1) his failure to disclose to Coleman his prior decision in Pleau I and, additionally, (2) his failure to disclose to Coleman or Merastar his ex parte communication with Pleau regarding the judicial complaint. For sake of clarity, we limit our analysis in this section to the first of the Court of the Judiciary's findings regarding the allegations in Count II. The legal analysis relevant to the ex parte communication, including the second finding that Judge Bell should have disqualified himself from Pleau II for failing to disclose that communication to Coleman and Merastar's counsel, is included under the umbrella of Count III.

To the extent that the Court of the Judiciary found that Judge Bell automatically should have recused himself from Pleau II solely on the basis that he decided Pleau I and failed to disclose that prior decision to Coleman, we disagree. Judges routinely hear the same matter on multiple occasions, for instance, when a case is non-suited or after the appellate court remands the case. "A judge is in no way disqualified because he tried and made certain findings in previous litigation," State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995), and "the mere fact that a judge has ruled adversely to a party or witness in prior judicial proceedings is not grounds for recusal." Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 565 (Tenn. 2001). Therefore, a judge's prior decision in a case does not, in and of itself, make the judge prejudiced against any particular party, including a party that enters the case for the first time following remand. Nor does the fact that the judge previously heard the case give the court "personal knowledge of disputed evidentiary facts concerning the proceeding." Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a). Similarly, the history of the case does not qualify as

-13-

"information . . . the parties or their lawyers might consider relevant to the question of disqualification," see Tenn. Sup. Ct. R. 10, Canon 3(E)(1) cmt., at least insofar as that language assumes that such information is known only to the judge. The prior proceedings and court file are a matter of public record, and the fact that the new party may be unrepresented by counsel and thus fail to investigate the history of the case does not impose additional duties of disclosure, much less an obligation of disqualification, on the judge hearing the case. Judge Bell's failure to disclose to Coleman his prior decision in Pleau I, standing alone, is not a violation of Canon 3(E)(1).[14]

*Count III*

As to the allegations in Count III, we agree with the Court of the Judiciary that Judge Bell's phone call to Pleau through attorney Testerman while Pleau II was still pending in General Sessions Court amounted to an ex parte communication concerning a pending proceeding, in violation of Canon 3(B)(7). Judge Bell testified that he had received an anonymous phone call stating that Pleau would not pursue the complaint against Judge Bell. At the time, Judge Bell had pending a time-sensitive settlement offer from disciplinary counsel for a public reprimand instead of the institution of formal charges. Judge Bell testified that he obtained Testerman's representation to contact Pleau and determine whether Pleau would go forward with the complaint. Although Judge Bell claimed that he contacted Pleau through counsel because he did not want to be self-represented in litigating the judicial complaint, Testerman testified that the "gist" of his conversation with Judge Bell was that Judge Bell did not believe it was appropriate to contact Pleau directly.

Testerman's February 2, 2009 phone call on Judge Bell's behalf amounted to more than just an inquiry about Pleau's intentions. Per Pleau's affidavit and testimony, Testerman affirmatively requested that Pleau come to Testerman's office and sign paperwork dismissing the judicial complaint. Pleau testified that he "didn't like getting called by somebody telling me how to . . . run my life." Pleau further testified that Testerman's call "kind of irritated me because I really didn't think it was any of his business what I was doing." In declining to dismiss his judicial complaint, Pleau testified that he told Testerman, "[M]y mind is on the civil suit right now and I don't want to be sidetracked into other issues." Furthermore,

---

[14] Disciplinary counsel also maintains that Judge Bell should have disqualified himself from Pleau II because, at the December 23, 2008 hearing on Pleau I, Judge Bell discussed with Pleau and Merastar's counsel the upcoming trial of Pleau II. The transcript from that hearing reflected Judge Bell's knowledge that, although Coleman was absent on December 23, she had been served with the civil warrant in Pleau II. We do not address disciplinary counsel's argument because it exceeds the scope of the findings made by the Court of the Judiciary.

Testerman testified that he participated in a conversation with Pleau about the underlying facts of the accident.

Although Judge Bell had dismissed Pleau I by the time of this phone call, Pleau had already filed Pleau II and served the civil warrant on both Coleman, the new party, and Merastar. The parties were set to appear before Judge Bell on February 20, 2009, and Judge Bell was aware of that fact. Thus, Pleau II was "pending" at the time Judge Bell initiated the ex parte communication through Testerman. Furthermore, Pleau II arose from the same nucleus of facts as Pleau I, the case that had originally given rise to Pleau's filing a complaint with the Court of the Judiciary.

Based on the substance of the phone conversation and the interrelationship among Pleau I, Pleau's judicial complaint, and Pleau II, we are persuaded there is clear and convincing evidence that Testerman's phone call to Pleau on Judge Bell's behalf was an ex parte communication prohibited by Canon 3(B)(7). Judge Bell argues that he did not violate the canon because he asked Testerman to contact Pleau about the status of Pleau's complaint before the Court of the Judiciary, not the Pleau II case then-pending before the General Sessions Court. However, both Pleau and Testerman testified that Pleau II came up for discussion during the conversation. The fact that Judge Bell retained an attorney to contact Pleau instead of contacting Pleau directly is a distinction without a difference. See Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962); World Relief Corp. of Nat'l Ass'n of Evangelicals v. Messay, No. M2005-01533-COA-R3-CV, 2007 WL 2198199, at *5 (Tenn. Ct. App. July 26, 2007) (explaining that because lawyer is client's agent, "the acts and omissions of a lawyer undertaken during the course and in the scope of his or her representation . . . are attributed to th[e] client").[15]

Indeed, given that Pleau II was pending at the time, it is hard to fathom how any reasonable person would not view Testerman's phone call on Judge Bell's behalf as "concerning" Pleau II. Asking a litigant to drop a judicial complaint while the litigant still has a case pending before the judge creates the perception of a classic quid pro quo scenario. Pleau's reaction to the phone call predictably reflects the frustration that a litigant would feel toward this kind of unwarranted pressure from the judge who is adjudicating his case.

---

[15] We also reject Judge Bell's argument that he did not violate Canon 3(B)(7) because he did not "consider" anything Testerman learned in the conversation with Pleau. Canon 3(B)(7) states that "[a] judge shall not initiate, permit, or consider ex parte communications" (emphasis added). The disjunctive phrasing means that simply initiating the ex parte communication is enough to establish a violation, regardless of the extent to which the judge "considers" the information obtained through the communication. See Foster v. United States, 615 A.2d 213, 216 (D.C. 1992).

Therefore, in addition to a prohibited ex parte communication, Judge Bell's initiation of a phone call asking Pleau to dismiss his judicial complaint manifestly fails to "promote[] public confidence in the integrity and impartiality of the judiciary." Tenn. Sup. Ct. R. 10, Canon 2(A). Clear and convincing evidence also supports the Court of the Judiciary's finding that Judge Bell violated Canon 2(A).

Related to the ex parte communication is the Court of the Judiciary's finding (made as to Count II) that Judge Bell did not reveal to Coleman or Merastar's counsel his ex parte communication with Pleau. Clear and convincing evidence also supports this finding and the conclusion that, having failed to disclose the ex parte communication, Judge Bell violated Canon 3(E)(1) by failing to disqualify himself from Pleau II. While the mere filing of Pleau's complaint in the Court of the Judiciary did not mandate Judge Bell's recusal, see State v. Parton, 817 S.W.2d 28, 29-30 (Tenn. Crim. App. 1991), Testerman's communication with Pleau on Judge Bell's behalf caused Judge Bell's impartiality to him to reasonably be questioned. Even if Judge Bell subjectively believed the communication provided no basis for disqualification, he should have disclosed on the record that, through counsel, he had inquired whether Pleau intended to proceed with his judicial complaint and had invited Pleau to counsel's office to sign dismissal paperwork. Similarly, the other parties were entitled to know about this communication. Judge Bell should have recognized that Coleman and Merastar's counsel might have considered this communication, as well as Pleau's decision to continue forward with the complaint, relevant to the question of disqualification. See Tenn. Sup. Ct. R. 10, Canon 3(E)(1) cmt. Having failed to disclose his communication to Coleman and Merastar's counsel, Judge Bell should have disqualified himself from hearing Pleau II. His failure to do so is clear and convincing evidence of a violation of Canon 3(E)(1).

In summary, we affirm the Court of the Judiciary's findings that Judge Bell's delay in deciding Pleau I violated Canon 3(B)(8) and that Judge's Bell ex parte communication through counsel violated Canons 2(A), 3(B)(7), and 3(E)(1). We do not affirm the finding that Judge Bell's failure to disclose to Coleman the findings in Pleau I violated Canon 3(E)(1).[16] We now proceed to review the penalty assessed by the Court of the Judiciary.

_____

[16] We are not persuaded by Judge Bell's other arguments for relief. Judge Bell claims that disciplinary counsel selectively prosecuted him because other judges have delayed decisions for much longer periods of time without being sanctioned. The examples that Judge Bell cites, however, are factually inapposite because they involve mere delay, and this case involves other misconduct in addition to delay.

Finally, Judge Bell argues that disciplinary counsel improperly refused to produce documents prepared and reviewed by its testifying investigator, James LaRue. With respect to this issue, however, Judge Bell fails to make any citation to the record or to offer meaningful argument. Therefore, this issue is

(continued...)

*Appropriateness of Penalty*[17]

"Intrinsic" to the Code of Judicial Conduct "are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system." Tenn. Sup. Ct. R. 10, Preamble. Tennessee Supreme Court Rule 10, Canon 1(A) provides that "an independent and honorable judiciary is indispensable to justice in our society." Canon 2(A) provides in pertinent part that a judge shall "respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." These highest standards of conduct are necessary to preserve the integrity and independence of the judiciary. In re Murphy, 726 S.W.2d 509, 515 (Tenn. 1987). As we previously observed in In re Williams, when a judge violates the Code of Judicial Conduct, it "reflect[s] poorly on the judicial system as a whole. Public confidence in the performance and impartiality of the judiciary is maintained only when judges rigorously adhere to the Code of Conduct. Violations of the Code, if left unaddressed, diminish public confidence and injure the entire judicial system." 987 S.W.2d at 844. Furthermore, as the Supreme Court of Wisconsin stated in affirming a ninety-day suspension as discipline for a judge's ex parte communications:

> Discipline imposed for judicial misconduct is to be responsive to the gravity of the misconduct—the actual harm or threat of harm it posed to those using our court system and to the system itself. Discipline is not intended to

---

[16](...continued)
waived. See Tenn. R. App. P. 27(a)(7); Chiozza v. Chiozza, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009).

[17] Since the General Assembly created the Court of the Judiciary in 1979, see Act of May 23, 1979, ch. 356, § 4, 1979 Tenn. Pub. Acts 833, 834, this Court has had relatively few opportunities to review the Court of the Judiciary's decisions. See In re Williams, 987 S.W.2d 837; In re Brown, 879 S.W.2d 801 (Tenn. 1994); In re Murphy, 726 S.W.2d 509. In In re Murphy, we affirmed the recommendation that the General Assembly remove from office a General Sessions Court judge who was convicted in federal court on eleven counts of mail fraud, one count of perjury, and one count of obstruction of justice. 726 S.W.2d at 510, 515; see Tenn. Code Ann. § 17-5-311(a) (explaining that, where this Court affirms the Court of the Judiciary's recommendation of the judge's removal, the question of removal is forwarded to the General Assembly for a final decision). Later, in In re Williams, we again affirmed the recommendation of removal from office of a General Sessions Court judge who used a jail inmate for personal work (a class A misdemeanor), tried felony offenses over which the court lacked jurisdiction, and provided false testimony and responses to interrogatories in a federal proceeding. 987 S.W.2d at 838. In In re Brown, we affirmed the public reprimand of a Criminal Court judge who delayed seven months before responding to a judicial complaint. 879 S.W.2d at 807; cf. United States v. Lanier, 520 U.S. 259, 261 (1997) (adjudicating appeal of Chancery Court judge who was convicted pursuant to federal criminal statute of violating victims' constitutional rights by sexually assaulting them).

punish the judge; it serves to protect our court system and those having recourse to it from further, similar abuses. . . .

. . . .

Inevitably, members of the public will, from time to time, disagree with decisions of our courts, but that disagreement should never rest upon lack of confidence in the court's integrity. Public confidence in the integrity of the judicial system is essential. It is our responsibility, and the responsibility of every judge, to merit and maintain that confidence. The suspension we impose is a measure of the seriousness of [the judge's] actions and is designed to foster confidence in the integrity the public has every right to expect and demand of its judicial system.

In re Disciplinary Proceedings Against Aulik, 429 N.W.2d 759, 768 (Wis. 1988).

According to the Preamble to our Code of Judicial Conduct:

[w]hether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable and reasoned application of the text and should depend on such facts as the seriousness of the transgression, whether there is a pattern of improper activity, and the effect of the improper activity on others or on the judicial system.

Tenn. Sup. Ct. R. 10, Preamble. By statute, the Court of the Judiciary has the power to impose an enumerated sanction (or combination of sanctions), including "[s]uspension without impairment of compensation" and "limitations and conditions on the performance of judicial duties." Tenn. Code Ann. § 17-5-301(f)(1)-(2) (2009). The statute also sets forth a list of criteria for the Court of the Judiciary to consider in determining the appropriate sanction(s). Tenn. Code Ann. § 17-5-301(i).

In this case, the Court of the Judiciary found that the following statutory criteria applied: prior complaints about Judge Bell, including a prior warning for delay; misconduct occurring both inside and outside the courtroom; no evidence of effort to change or modify conduct; misconduct occurring while acting in an official capacity; the failure to acknowledge the nature and impropriety of his actions; and the effect of his misconduct on the integrity of and respect for the judiciary. See Tenn. Code Ann. § 17-5-301(i)(3)-(6), (8)-(9). For Judge Bell's violations of the Code of Judicial Conduct, the Court of the Judiciary determined the appropriate sanctions to be a ninety-day suspension without impairment of

compensation, a requirement to decide all future cases within thirty calendar days of the hearing, and the completion of judicial ethics training.[18]

The Court of the Judiciary carefully considered all the factors in imposing a penalty. Even though we disagree with one portion of the Court of the Judiciary's findings, we do not disagree with its conclusion about the serious nature of the other findings. To maintain the integrity of and public confidence in our judicial system and to discourage similar instances of misconduct in the future, we affirm the sanctions that the Court of the Judiciary has imposed on Judge Bell.

### Conclusion

For the reasons stated above, we affirm the Court of the Judiciary's judgment concerning the violations of the Code of Judicial Conduct arising from Judge Bell's delay in deciding Pleau I and his ex parte communication through attorney Testerman. For the reasons stated in the Count II analysis, we reverse the Court of the Judiciary's judgment concerning the violation arising from Judge Bell's failure to disclose to Coleman his prior decision in Pleau I. We also affirm the determination of sanctions, including the ninety-day suspension. Costs of this appeal are taxed to Judge John A. Bell and his surety, for which execution may issue, if necessary.

_____
CORNELIA A. CLARK, CHIEF JUSTICE

---

[18] The Court of the Judiciary's order allocated the judicial ethics training as follows: twenty-four hours in 2010, twelve hours in 2011, and six hours in 2012.