IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 23, 2011 Session

# DANIELLE MALMQUIST v. SHEM MALMQUIST

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT00435606     Jerry Stokes, Judge**

**No. W2010-00970-COA-R3-CV - Filed September 16, 2011**

This case involves post-divorce petitions for contempt and recusal. During the divorce, the trial judge issued an injunction preventing the parties from filing any actions against the other party without the judge's prior approval. Appellee filed the present action for contempt against Appellant for violation of that injunction. Prior to the hearing on the contempt petition, Appellant filed a motion for the trial judge to recuse himself based on threats allegedly made by Appellant on the judge's life. The trial judge denied the motion to disqualify and found Appellant in contempt. Appellant appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Robert L. DeLaney, Nashville, Tennessee, for the appellant, Danielle Malmquist.

Roger K. Rutledge, Memphis, Tennessee, for the appellee, Shem Malmquist.

**OPINION**

### I. Background and Procedural History

The Plaintiff/Appellee, Shem Malmquist ("Mr. Malmquist"), and the Defendant/Appellant Danielle Malmquist ("Ms. Malmquist") married on October 27, 2004. After an approximately five month marriage, Mr. Malmquist filed for divorce and asked to be named primary residential parent of the couple's two children. What followed was an extremely contentious and protracted divorce, which was the subject of a prior appeal to this

Court. *See Malmquist v. Malmquist,* No. W2007-02373-COA-R3-CV, 2011 WL 1087206 (Tenn. Ct. App. March 25, 2011) ("Malmquist I"). In our recitation of facts, we rely both on the facts as set out in Malmquist I and on the appellate record.

The Honorable James Russell was originally assigned the divorce case in the Shelby County Circuit Court, but transferred the case, on May 24, 2006, due to a conflict. The case was then assigned to the Honorable Jerry Stokes under a random selection process. Judge Stokes presided over both the divorce and all post-divorce proceedings. On June 1, 2006, Judge Stokes entered an order on Mr. Malmquist's first request for injunctive relief. The court enjoined Ms. Malmquist from filing any action in any other court regarding any issue within the jurisdiction of the circuit court, including requests for custody of the children and temporary support. Because the first injunction did little to stem the tide of litigation, Mr. Malmquist again petitioned the court for an injunction preventing Ms. Malmquist from filing any suits or charges, whether criminal or civil, against him without receiving written permission from the court. Both parties agreed to be bound by the injunction and a consent order was entered on January 19, 2007, effective *nunc pro tunc* to September 11, 2006.

The consent order provided that Ms. Malmquist is:

> [S]trictly enjoined and commanded to absolutely desist and refrain and be enjoined from making charges or claims of any kind, whether civil or criminal, and from filing any suits or charges against Plaintiff, Shem Malmquist, unless and until she shall first have applied in writing to this Court for and received from the Court written permission to do so.

Additionally, the parties were required to "comply with and follow all procedures and requirements of the Tennessee Rules of Civil Procedure regarding giving notice to each other, certification of notice, conduct of discovery, and the filing of pleadings and motions."

The trial court entered a final decree of divorce on July 11, 2007; however, myriad post-divorce motions were filed. Ms. Malmquist's initial post-trial filings included: (1) a Rule 60 motion for recusal, relief from judgment, and new trial; (2) an emergency petition for injunctive relief to prohibit Mr. Malmquist's new wife from spending unsupervised time with the children pending a psychological exam; (3) a second motion for recusal; (4) a motion to disqualify the guardian ad litem ("GAL"); (5) and a motion for sanctions against Mr. Malmquist's attorneys. During the course of the proceedings, Ms. Malmquist also filed a number of complaints against Judge Stokes with the Court of the Judiciary, at least two of which were dismissed.

On August 17, 2007, Mr. Malmquist filed his first Petition for *Scire Facias* and Citation for Criminal Contempt. On September 4, 2008, after numerous motions and

continuances, Judge Stokes found Ms. Malmquist guilty of criminal contempt and sentenced her to ten days in jail.[1] After learning that Ms. Malmquist was to start a new job in Nashville, and that confining her to jail for ten days in Memphis would threaten her new employment, Judge Stokes suspended seven days of the sentence. In the transcript of the hearing on this contempt petition, Judge Stokes specifically cautioned:

> Now let me tell you something Ms. Malmquist, about the other days that are being suspended. Those days will hang over your head. They will hang over your head for the next six months. If there is another violation of this Court's Order, then those seven days will come down, and you will have to do those seven days.
> My court orders are meaningful. They mean what they say. And I mean what I rule. And if there is any defiance, there has to be consequences.

From every indication in the record, Ms. Malmquist immediately served her time in jail and did nothing to contest the first contempt judgment once it was entered.

Unfortunately, the first jail sentence did not deter Ms. Malmquist from filing still more actions against her former husband. Mr. Malmquist again filed a Petition for *Scire Facias* and Citation for Criminal Contempt petition on January 14, 2010. This petition, as well as the proceedings following it, are the subject of the current appeal. In his petition, Mr. Malmquist alleged five counts of contempt, all for violations of the September 2006 injunction. Mr. Malmquist's first count involved two actions, which were filed by Ms. Malmquist in the United States District Court for the Western District of Tennessee, Western Division, claiming, among other things, malicious prosecution and civil conspiracy.[2] Mr. Malmquist introduced the complaints filed in district court to prove these allegations. Next, Mr. Malmquist introduced a petition for emergency injunctive relief filed by Ms. Malmquist against him and his wife in the 20th Judicial District for Davidson County.[3] Mr. Malmquist

---

[1] The record does not elaborate concerning the allegations in the first contempt proceeding.

[2] Ms. Malmquist commenced the first federal action on January 22, 2007. The complaint is styled *Complaint for Violation of Civil Rights, Violation of Federal Consumer Protection Law, Malicious Harassment, Outrageous Conduct, Malicious Prosecution, Defamation, and Civil Conspiracy*. Mr. Malmquist was served with this lawsuit and was required to appear and retain counsel to defend against it until the court dismissed the claim against him. Ms. Malmquist filed the second federal action on January 22, 2008. The complaint is styled *Complaint For Malicious Prosecution, Abuse Of Process, And Conversion, Outrageous Conduct, Violation Of Fair Debt Collection Practices Act, And Civil Conspiracy*. Mr. Malmquist was never served with this complaint, nor did he ever appear and defend it.

[3] Ms. Malmquist commenced this action on June 24, 2009. Mr. Malmquist was required to retain
(continued...)

then presented evidence that Ms. Malmquist had sworn out an affidavit against him for domestic assault, and that, as a result, he and his wife were arrested and jailed overnight.[4] Mr. Malmquist also introduced a letter that Ms. Malmquist had allegedly written to the Department of Motor Vehicles, Driver Improvement Section ("DMV") stating that Mr. Malmquist was unfit to drive and calling for an investigation.[5] Finally, Ms. Malmquist caused several subpoenas to be issued in the original divorce case. Mr. Malmquist was not given proper notice of the subpoenas and the trial judge issued an order quashing them. Ms. Malmquist never received written permission from Judge Stokes to commence any of these actions.

Instead of filing an answer to the contempt petition, Ms. Malmquist filed an application for extraordinary appeal to this Court on February 24, 2010; we denied her application by order of February 25, 2010. Next, on March 16, 2010, Ms. Malmquist filed a motion, in the trial court, to disqualify Judge Stokes, along with a memorandum of facts and an affidavit in support of her motion. In her affidavit, Ms. Malmquist alleged that Judge Stokes was biased based on an alleged threat made by Ms. Malmquist against Judge Stokes.

The relevant facts surrounding the alleged threat are found in Ms. Malmquist's affidavit and the exhibits attached to her Motion to Disqualify. On September 26, 2008, Mona Martin, Judge Stokes' courtroom clerk, received a message from Lisa Akin, a private investigator employed by Mr. Malmquist. Ms. Martin returned the call on September 30, 2008. During this call, Ms. Akin told Ms. Martin that she was dropping off some papers at Mr. Malmquist's home when she learned of a threat on Judge Stokes' life. According to police reports, Ms. Akin overheard Michelle Mueller Hogan[6] tell Mr. Malmquist that Ms. Malmquist had made a threat on Judge Stokes' life. Ms. Martin informed Judge Stokes of the

---

[3](...continued)
counsel to appear and defend the case, though he never appeared before the court in Nashville and his attorney's fees were primarily funded through an insurance policy.

[4] The affidavit, which was sworn out on October 13, 2009, alleged that Mr. Malmquist had admitted in court that he was the author of a song about Ms. Malmquist, threatening to kill her if she did not leave Memphis and never return. Ms. Malmquist informed police that the song was posted on a blog and was sent to her in a letter. The charges were eventually dropped. Because of the arrest, however, Mr. Malmquist was required to incur legal expenses and miss several days of work while returning from Nashville.

[5] The letter alleged that Mr. Malmquist suffered from "fainting spells" and had been suspended from his job as a pilot. Citing concern for her children, the author requested that Mr. Malmquist be evaluated and that his license be suspended "if necessary." The Department of Motor Vehicles did order a physical evaluation of Mr. Malmquist subsequent to this letter, which he passed.

[6] Nothing in the record indicates what relationship Ms. Hogan had with either of the parties.

alleged threat. Although Judge Stokes did not give credence to the alleged threat, he did allow his courtroom deputy to report the allegation to his supervisor as required under the court security policy. Ms. Martin also filed a police report with the Memphis Police Department, who then turned the investigation over to Sergeant Faith Cunningham of the Shelby County Sheriff's Department.

During the investigation, law enforcement spoke directly with Judge Stokes on three occasions. First, Sgt. Cunningham spoke with Judge Stokes on October 3, 2008. At that time, both Judge Stokes and Sgt. Cunningham agreed that it would be difficult to move forward with the case based on the lack of evidence. Sgt. Cunningham and Judge Stokes spoke again on October 4, 2008; at that time, Judge Stokes indicated that he was considering recusing himself. Then, on February 11, 2009, Officers Michael Harber and Chad Cunningham of the Criminal Intelligence Unit of the Homeland Security Division went to Judge Stokes' chambers to give him an update on the investigation. The officers explained that they had been unable to make contact with all the witnesses. However, later that day, the officers spoke with Ms. Hogan who gave her account of the alleged threat. Ms. Hogan explained that Ms. Malmquist had never actually threatened to harm Judge Stokes, or even stated a desire to do so. Instead, Ms. Hogan had merely stated to Mr. Malmquist that, based on Judge Stokes' actions in court during the divorce proceedings, Ms. Malmquist "probably wanted to kill Judge Stokes." Ultimately, the officers decided to conclude the investigation and close the case. During the course of the investigation, none of the officers made contact with Ms. Malmquist; rather, on December 9, 2009, Ms. Malmquist called Sgt. Cunningham to obtain a copy of the police report. Judge Stokes never informed the parties of the investigation or mentioned the threat allegations. Nothing more was done with regard to the threat until Ms. Malmquist filed her Motion to Disqualify on March 16, 2010.

Mr. Malmquist filed a response to Ms. Malmquist's Motion to Disqualify on March 19, 2010 and the court heard arguments that day. During arguments, Judge Stokes explained his view of the facts surrounding the threat, as well as his reasoning for not disclosing the threat or recusing himself from the matter:

> Ms. Martin had someone, Ms. Lisa Akins,[7] a private investigator, tell her that a third party told Ms. Akins that the third party heard Ms. Malmquist, your client, say that she, words to the effect, either she wished me dead or wanted me dead, and that remark was made, I think, after the Court was down one particular day. And it was overheard by my courtroom deputy, David

---

[7] Throughout the proceedings on the Motion to Disqualify, Judge Stokes refers to Mr. Malmquist's private investigator as Lisa Akins. However, other documents show her name to be Lisa Akin. We will refer to the private investigator as Lisa Akin throughout this opinion.

McKinney. And I didn't think very much of her remark, but my court officer indicated that: Judge, I think I need to report this to my supervisor.

And I said: Well, I don't think much of it, but if it's your protocol as a courtroom deputy, go ahead and do that.

So he did. And somebody from courtroom security came up the next day and asked me: Judge, are you okay? Is there anything we can do? Can we give you extra security?

I said: No, the remark was an ambiguous one as far as the court was concerned.

And I thanked the supervisor and said: Well, everything's okay; I don't want any additional security.

That was the end of it as far as I was concerned; however, I was contacted maybe a day or two later by a detective over the telephone, I forgot her name, it was a female detective, who indicated to me—she asked me my name and address and some other basic or static information, and I gave it to her. And she asked me: Is there anything I could add to this remark?

I said: Look, the sum total of all I knew about it is what my courtroom clerk told me, period.

And we talked for another minute and-a-half or so, and she asked me whether I'm going to stay on the case, and I said: Based on what I've heard, yes.
She said: Look, Judge, we can go and talk to Ms. Malmquist if you'd like, I don't think it's a good idea, but I will if you want me to.

And I said: No, based upon that, I agree with you that you shouldn't do that. And as far as I knew, she didn't. That was the end of our conversation. This was in the fall of 2008. I never heard from her again, period. And I looked at this, Mr. Delaney, in the context of the bigger picture. This is a case that I've been involved in for the last three years. The case came to me: I did not— it was not an original filing. It landed in Division VI; it came from another judge. Whether it's right or wrong, it's my case.

We had a trial in this case that lasted over all of a month. It involved

over 100 exhibits. It involved in excess of 35 witnesses, multiple experts.

And during that trial, there was a Lisa Akins, a private investigator hired by Mr. Malmquist, your client's ex-husband, who was hired to do surveillance on Ms. Malmquist for several days. Ms. Malmquist, obviously, detected the surveillance, then began to do surveillance on Ms. Akins for a longer period of time, to such a period—and this all that came out during the trial—that Ms. Akins became nervous, frightened, tried to get a restraining order against Ms. Malmquist, tried to get Ms. Malmquist arrested.

Then Ms. Malmquist, as proof developed during the trial, filed a lawsuit against Ms. Akins and a host of other people, maybe 20 other people; Mr. Malmquist, Mr. Malmquist's lawyers, Memphis Police Department, Germantown Police Department and a number of other people, Ms. Akin's husband, who is a police officer himself.

* * *

So I viewed the remark by Ms. Martin that she heard from Ms. Akins with some skepticism because I knew the history between Ms. Malmquist, your client, and Ms. Akins, that there may have been some axe to grind between the two of them. I viewed the remark that Ms. Martin heard regarding the remark attributed to Ms. Malmquist in the context of a bigger picture as well.

Ms. Malmquist, I did, in fact, send her to jail for a violation of a very specific order that I had in place. And I didn't do it under cover of darkness; I did it in Court. It was—Ms. Malmquist had two lawyers and—one that I appointed, she hired another. . . There was a full hearing. . . and after I heard all the proof I did, in fact, send her to jail.

So I understand the dynamics of when a party does not get what he or she wishes after a hearing. There are winners and losers. . . I understand that. I was a lawyer, too.

I also looked at in the context of previous motions that have been filed against this Court by Ms. Malmquist. I think I've had six, seven motions for recusals, and I've denied them all. This is very much like what one judge said, that I forget his name, he indicated that once he took an oath to be a judge, he took it to take the easy cases as well as the difficult cases. I did not feel, and I still don't feel, that I have a duty to tell Ms. Malmquist that I heard from my

clerk who heard from a private investigator, who testified during a trial, that a third party told that investigator that Ms. Malmquist said to that third party that she wanted to—wanted me dead or wished I was dead.

I gave you that backdrop . . . because you are probably lawyer number 12 for Ms. Malmquist. And I say that not disparagingly, but I have to bring prior counsel up to speed based upon the history of this case.

* * *

. . . Your papers tend to suggest that there is some heated rivalry between the Court and Ms. Malmquist. There is none.

These complaints [to the Court of Judiciary] you reference, they are confidential. I will not divulge that or talk about that. Every citizen has a right to complain that the Court—if they feel the Court has not treated them fairly or if I've violated some oath of my office, you absolutely have a right to complain, and I respect that. But nothing I've done in this case, I submit warrants me to recuse myself from hearing further matters in this case.

You see . . . if that was the case, any lawyer who feels aggrieved my [sic] one of my rulings could easily do the same thing and get one of the other eight judges to hear a case. I have no strong affinity for Malmquist versus Malmquist. It would be very easy for me to say: Sure, let one of my eight colleagues handle this.

But I took an oath to follow the constitution, to administer justice fairly and impartially without respect to persons. I think I have done that in this case, at least I've tried to do that. I tell you all of that . . . to tell you I have considered your motion. I'm familiar with this case. I don't cut people off generally, I hear everything they have to tell me. I digest it, I consider the law, and I rule. I try to give bases for my rulings, not every person likes it.

I know your client definitely doesn't like a lot of my rulings, maybe not any of my rulings, but that the nature of what we do. . . . But none of what you've provided in your submission to me warrant my recusal from this case.

I did not think that the remark was a credible remark that's attributed to your client. I told you it was met with much skepticism. I looked at it in a broader sense of all that has occurred in the last four years since I've heard this

-8-

case. So for those reasons your motion to disqualify is denied.

On March 26, 2010, Judge Stokes entered an order denying Ms. Malmquist's Motion to Disqualify, and incorporating, by reference, the verbatim transcript of the proceedings. On the same day, he denied the application for Appeal by Permission, which was filed by Ms. Malmquist on March 23, 2010.

On March 31, 2010, Ms. Malmquist filed an application requesting that this Court grant her an extraordinary appeal pursuant to Tennessee Rule of Appellate Procedure 10 or, in the alternative, for an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9. We denied the application by order of April 15, 2010.

On April 5, 2010, Ms. Malmquist filed a motion to revise the trial court's order denying the Motion to Disqualify. Therein, Ms. Malmquist reiterated her earlier arguments in support of the motion to disqualify. In the April 5 motion, Ms. Malmquist also introduced a letter written by Judge Stokes to Patrick McHale of the Tennessee Court of the Judiciary. This letter was in regards to a complaint made by Ms. Malmquist. The letter states generally the same factual basis and reasoning given by Judge Stokes in the prior proceedings on the Motion to Disqualify. In his letter, Judge Stokes also enclosed copies of letters informing him of the dismissal of two previous complaints against him by Ms. Malmquist. Ms. Malmquist later supplemented her motion with the recent Tennessee Supreme Court case, *Bean v. Bailey*, 280 S.W3d 798 (Tenn. 2009). Judge Stokes denied this motion on August 25, 2010, effective *nun pro tunc* to April 9, 2010.

On April 9, 2010, the trial court was finally able to have a hearing on the contempt petition, which was filed on January 14, 2010. At the close of the evidence, Judge Stokes found that Ms. Malmquist violated the September 2006 injunction, beyond a reasonable doubt, on four of the five counts alleged. Judge Stokes further found that the complaint, alleging that Ms. Malmquist had sent the letter, requesting that Mr. Malmquist be investigated by the DMV, was not proved beyond a reasonable doubt because Ms. Malmquist's signature was not on the letter. The court, therefore, found Ms. Malmquist guilty of four counts of contempt and ordered her to serve 10 days in jail for each count, to be served concurrently. Judge Stokes allowed Ms. Malmquist to post bond, in the amount of $5,000.00, pending appeal. The order on the contempt petition was entered on April 23, 2010.

Ms. Malmquist filed her Notice of Appeal to this Court on April 26, 2010. Upon review of the record, this Court concluded that the order appealed was not final because it did not dispose of the costs and attorney's fees prayed for in the Petition for *Scire Facias* and Complaint for Criminal Contempt. Ms. Malmquist was ordered to obtain an order of final

judgment in the trial court within ten days. In response, Ms. Malmquist filed the Supplemental and Final Order on Plaintiff's Petition for *Scire Facias* and Citation for Criminal Contempt and for Sanctions, which denied the prayer for monetary sanctions and attorneys fees. It appears that the order appealed is now final so as to confer appellate jurisdiction on this Court. Tenn. R. App. P. 3(a).

## II. Issues Presented

Ms. Malmquist raises two issues, which we restate as follows:

1. Whether the trial judge abused his discretion in declining to recuse himself from the proceedings;
2. Whether the evidence was sufficient to sustain the convictions for criminal contempt.

## III. Recusal

A judge's decision to grant a recusal is within his or her discretion. ***Bean v. Bailey***, 280 S.W.3d 798, 805 (Tenn. 2009); ***Bd. Of Prof'l Responsibility v. Slavin,*** 145 S.W.3d 538, 546 (Tenn. 2004). Accordingly, a trial judge's decision will not be reversed unless there is a clear abuse of discretion. ***Bean***, 280 S.W.3d at 805; ***Davis v. Liberty Mutual Ins. Co.***, 38 S.W.3d 560, 564 (Tenn. 2001). Under the abuse of discretion standard, the trial court's decision "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." ***Camp v. Camp***, No. W2010-01037, COA-R3-CV, 2011 WL 2567542, at *5 (Tenn. Ct. App. June 29, 2011) (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001)).

The abuse of discretion standard involves "a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." ***Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010) (citing ***Beard v. Bd. of Prof'l Responsibility***, 288 S.W.3d 838, 860 (Tenn. 2009)). The standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***Overstreet v. Shoney's, Inc.***, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). Accordingly, appellate courts are not permitted to "second guess" the trial court's determinations or to substitute their judgment for that of the trial court. ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***White v. Vanderbilt Univ.***, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). "The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny." ***Lee Medical, Inc.***, 312 S.W.3d at 524 (citing ***Boyd v. Comdata Network, Inc.***, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002)).

Ms. Malmquist argues that Judge Stokes should be disqualified from this case based on three errors regarding the alleged threat. First, Ms. Malmquist argues that Judge Stokes should be disqualified because his failure to disclose an *ex parte* communication violates the Code of Judicial Conduct and creates the appearance of partiality. Next, Ms. Malmquist argues that the alleged threat created a personal bias requiring Judge Stokes to recuse himself under state and federal law. Finally, Ms. Malmquist argues that the alleged threat on Judge Stokes' life gave him an "interest" in the outcome of the litigation and, therefore, required recusal. We will address each of these arguments in turn.

## A. *Ex Parte* Communications

Ms. Malmquist first argues that Judge Stokes was required to disclose to the parties the substance of his communication with Ms. Akin pursuant to Tennessee Supreme Court Rule 10, Canon 3(B)(7) regarding *ex parte* communications. Communications with a judge outside the presence of both parties are generally prohibited by Tennessee Supreme Court Rule 10, Canon 3(B)(7). Canon 3(B)(7) states that a judge shall not "initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding."

Black's Law Dictionary defines *ex parte* as "done for, in behalf of, or on the application of, one party only." Black's Law Dictionary, 517 (5th ed. 1979). Likewise, A Dictionary of Modern Legal Usage defines an *ex parte* communication as one that "involves only one party," and comes from the Latin, meaning "from or on behalf of only one side of a lawsuit." Bryan A. Garner, A Dictionary of Modern Legal Usage 340 (2nd ed. 1995).

As a threshold requirement in order to trigger the disclosure requirement of Canon 3(B)(7), the communication must have been from or on behalf of one of the parties or concerning a pending or impending proceeding. In Tennessee cases, where reviewing courts have held that the trial court abused its discretion in failing to disclose *ex parte* communications, the alleged *ex parte* communications were either made by, or on behalf of, parties to the suit, or were communications with non-parties concerning pending or impending proceedings in the trial court. *See, e.g., In re Bell*, No. M2010-01447-SC-R3-CJ, 2011 WL 2304191 (Tenn. June 10, 2011) (involving a communication with a party to a lawsuit that was currently pending in the judge's court); *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009) (involving a communication between the judge and undisclosed persons, which the judge cited as giving him permission to preside over a case currently pending in his court). Ms. Malmquist cites no cases to support her assertion that the communication of the alleged threat against Judge Stokes was, in fact, an *ex parte* communication.

Turning to the record, there is no indication that the communication, at issue here, was

attributable to either of the parties. At best, the record shows that Mr. Malmquist was aware of the alleged threat, but the record contains no evidence that he directed Ms. Akin to inform the judge of the threat. From our review of the record, there is nothing to connect either party to the communication of the threat to Judge Stokes.

The threat also did not concern a pending or impending proceeding. Black's Law Dictionary defines pending as "[b]egun, but not yet completed" and "awaiting an occurrence of conclusion of an action, period of continuance or indeterminancy." Black's Law Dictionary 1021 (5th ed. 1979). Impending is generally defined as "a matter that is imminent or expected to occur in the future." *Bauer v. Shepard*, 634 F.Supp.2d 912, 930 (N. Dist. Ind. 2009).

Ms. Akin communicated the threat on September 30, 2008. At the time the threat was communicated to Judge Stokes, no proceeding was pending or impending with the trial court. The first contempt petition concluded when the trial judge entered judgment and Ms. Malmquist served her sentence without further contesting the matter; nothing in that case was "awaiting an occurrence of conclusion of an action." The only decision made by the trial court that was not final was the original divorce and custody decision, which was on appeal at the time. It is well established, however, that, once a party perfects an appeal from a trial court's final judgment, the trial court effectively loses its authority to act in the case without leave of the appellate court—perfecting an appeal vests jurisdiction over the case in the appropriate appellate court. *Cantrell v. Tolley*, No. W2010–02019–COA–R3–CV, 2011 WL 3556988, at *5 (Tenn. Ct. App. Aug. 11, 2011); *Spann v. Abraham*, 36 S.W.3d 452,461 (Tenn. Ct. App. 1999) ("The legal effect of perfecting an appeal is to divest the trial court of further authority to act without leave of the appellate court and to vest jurisdiction in the court of appeals."). In support of her argument regarding the contempt issue, Ms. Malmquist even states that the notation on the trial court's docket sheet mistakenly indicated that the case was closed and that "little if any activity has occurred in it." Accordingly, the communication of the threat could not concern a pending or impending proceeding as there were none at the time the communication was made. Having found that this communication was not made by or on behalf of a party, and that the communication did not concern a pending proceeding, we conclude that the communication, in this case, was not *ex parte*. Consequently, the communication does not fall under the prohibitions of Canon 3(B)(7), and, therefore, Judge Stokes did not err in declining to disclose it to the parties.

## B. Bias

Ms. Malmquist next argues that Judge Stokes should have disqualified himself because the alleged threat created a bias against Ms. Malmquist. Tennessee Supreme Court Rule 10, Canon 3(E) outlines the basis for disqualification on grounds of bias. Canon 3(E)(1) states, in pertinent part:

A judge shall disqualify himself or herself in a proceeding in which a judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Ms. Malmquist first argues that Judge Stokes' failure to disclose the communication violates Canon 3(E) and that he should have disqualified himself. The comments to the Cannon are informative, and state that "[a] judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." Tenn. Sup. Ct. R. 10, Canon 3(E)(1) cmt. Canon 3(E) makes clear that disclosure is only required when "the judge believes" that the information might be relevant. As set out in full context above, Judge Stokes stated that he met the threat with "much skepticism" and that he did not think he was required to disclose the threat to the parties. Indeed, nothing in the record shows that Judge Stokes took the threat seriously; Judge Stokes never directed his clerk or his deputy to report the threat, nor did he encourage the investigation. In fact, the police report shows that both Judge Stokes and law enforcement concluded that the threat was not serious, and agreed not to pursue further investigation. The record clearly shows that Judge Stokes did not credit this allegation. Based upon the evidence in this record, we cannot conclude that Judge Stokes abused his discretion in concluding that the communication was not serious, and was otherwise irrelevant to the proceedings. Consequently, he did not err in deciding not to disclose the communication to the parties.

Ms. Malmquist next argues that the fact that the communication was a threat against his life required Judge Stokes to recuse himself. While decisions regarding recusal are discretionary, the decision to recuse does not rest solely with the trial court's subjective belief that he or she can act impartially. *Bean*, 280 S.W.3d, at 805; *Camp v. Camp*, No. W2010–1037-COA-R3-CV, 2011 WL 2567542, at *7 (Tenn. Ct. App. June 29, 2011). Accordingly, the standard for recusal in Tennessee is whether "a person of ordinary prudence in the judge's position, knowing all the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Bean*, 280 S.W.3d at 805. The Tennessee Supreme Court has noted that, even if the trial judge subjectively believes that he or she can be impartial, he or she may still be disqualified if the judge's impartiality can reasonably be questioned, as "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Id*. at 805 (quoting Tenn. Sup. Ct. R. 10, Canon 3(E)(1)).

This issue of a threat against a judge was recently addressed by the Court of Criminal

-13-

Appeals, in *State v. Blanchard*, No. M2010–01186–CCA–R3–CD, 2011 WL 2533753, at *6 (Tenn. Crim. App. June 24, 2011). In *Blanchard,* the trial judge declined to recuse himself from a criminal case after the defendant threatened the judge outside the presence of the judge, but within the hearing of court personnel. Court personnel then informed the trial judge of the threat and the defendant subsequently filed a motion to disqualify the judge. In denying the motion to disqualify, the trial judge stated that the defendant was unhappy with his rulings and called the threat "an occupational hazard." *Id*. On appeal, the Tennessee Court of Criminal Appeals found that the judge had not abused his discretion in declining to recuse himself, noting:

> [The trial judge] stated that he did not take seriously the defendant's statements and minimized their impact by characterizing them as "an occupational hazard." Furthermore, the trial judge said that he could follow the law and remain impartial. The record is devoid of any showing that the trial court committed a clear abuse of discretion in this case.

*Id.*

Similar to the *Blanchard* case, here, Judge Stokes learned of a threat through a hearsay account from his court staff. However, the alleged threat against Judge Stokes does not exactly mirror the threat against the judge in *Blanchard*. Here, the threat was not made directly to the court personnel by a party, nor was it made in the presence of the judge. Rather, the alleged threat against Judge Stokes was, at best, double or triple-hearsay, which negates any indicia of reliability.

Much like the trial judge in *Blanchard*, Judge Stokes stated, on the record, that he did not give any credence to the threat and that the allegation had not influenced his decisions. Moreover, even the law enforcement officers tasked with conducting an independent investigation of the threat ultimately did not give the threat any credence; after speaking with the witnesses and objectively weighing the evidence, the law enforcement officers on the case concluded that the allegations regarding the threat were unfounded and closed the case on February 11, 2009, nearly a year before Mr. Malmquist filed the contempt petition at issue. This conclusion was wholly supported by the evidence. Ms. Akin allegedly overheard the threat as Ms. Hogan communicated it to Mr. Malmquist. According to Ms. Hogan, however, there was no threat; Ms. Hogan merely stated her own opinion that Ms. Malmquist was likely upset with the judge over his rulings in the divorce case and "probably wanted to kill [him]," which Ms. Akin misconstrued as a threat on Judge Stokes' life. Law enforcement obviously credited Ms. Hogan's explanation because they immediately closed the case after contacting her. Nothing in the record leads us to disagree with either Judge Stoke's analysis or with the independent investigation conducted by law enforcement in this case.

The fact that Judge Stokes helmed this litigation, without apparent bias, even in the face of difficult litigants and protracted litigation, supports his discretionary decision to remain on the case to see it concluded. In short, the record does not indicate any bias on the part of Judge Stokes; instead it is apparent from the record that Judge Stokes carefully considered the Motion to Disqualify in light of the particular circumstances of the case. Viewing this situation in light of the multitude of filings, attorneys, and motions to recuse, we conclude that a reasonable person would not question the trial judge's impartiality based on a triple-hearsay threat allegation made while no proceedings were pending in the trial court. Accordingly, we discern no clear abuse of discretion in Judge Stokes' denial of the Motion to Disqualify.

Ms. Malmquist also points to federal law as a basis for disqualification. While it is true that federal law will require a recusal when "the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable," the record is devoid of any showing that there was a probability of actual bias. *Caperton v. A.T. Massey Coal Co., Inc.*,129 S.Ct. 2252, 2257, 173 L.Ed.2d 1208 (2009). Notably, Ms. Malmquist cites only to cases distinguishable from the case on appeal: where the judge received sizable campaign contributions from a party, *Caperton*, 129 S.Ct. at 2257 (2009); where the judge presided over a criminal contempt case when the contempt charges involved attacks against the judge, *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971); and where the judge purposefully expedited a defendant's sentencing after an FBI-investigated threat was made on the judge's life, *U.S. v. Greenspan*, 26 F.3d 1001, 1005 (10th Cir. 1994). The case-at-bar simply does not rise to the level of bias found in the federal cases cited by Ms. Malmquist.

## C. Interest

Ms. Malmquist's final argument is that the alleged threat gave Judge Stokes an impermissible "interest" in the litigation, necessitating recusal. Tennessee Code Annotated Section 17-2-101 states that: "No judge or chancellor shall be competent, except by consent of all parties, to sit in the following cases: (1) Where the judge or chancellor is interested in the event of any cause; . . ." The term "interest" generally refers to "a right, claim, title, or legal share in something." Black's Law Dictionary 729 (5th ed. 1979). In the context of disqualification, "the term 'interest' has generally been construed to mean either a direct pecuniary or property interest, or one involving some individual right in the subject matter of the litigation." *Hawkins v. State*, 586 S.W.2d 465, 466 (Tenn. 1979) (citing *Chumbley v. People's Bank & Trust Co.*, 57 S.W.2d 787 (1933)). There is no evidence that Judge Stokes had a pecuniary or property interest in the litigation, nor is there evidence that he had a right in the subject matter. Therefore, he properly refused to disqualify himself on this basis.

Having found that Judge Stokes did not abuse his discretion in declining to recuse

himself, we now turn to Ms. Malmquist's second issue on appeal.

## IV. Contempt

Ms. Malmquist next argues that the evidence adduced at the hearing on Mr. Malmquist's Petition for *Scire Facias* and Citation for Criminal Contempt was insufficient to find that she had violated the September 2006 injunction beyond a reasonable doubt.

Courts may penalize a party for contempt when the party engages in "willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts." Tenn. Code Ann. §29-9-102(3). In criminal contempt cases, guilt must be proved beyond a reasonable doubt. *Barber v. Chapman*, 2004 WL 343799, at *2 (Tenn. Ct. App. Feb. 23, 2004) (citing *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996)). On appeal, however, those convicted of criminal contempt "lose their presumption of innocence and must overcome the presumption of guilt." *Barber*, 2004 WL 343799, at *2. Appellate courts do not consider the evidence in the light most favorable to the defendant and will only overturn criminal contempt convictions "when the evidence is insufficient to support the trier-of-fact's finding of contempt beyond a reasonable doubt." *Fox v. Fox*, 2010 WL 4244356, at *3 (Tenn. Ct. App. Oct. 26, 2010) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993)). "Furthermore, appellate courts review a trial court's decision of whether to impose contempt sanctions using the more relaxed abuse of discretion standard of review." *Barber*, 2004 WL 343799, at *2 (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993)). Reasonable doubt is "doubt engendered by an investigation of the whole proof and an inability, after such an investigation, to let the mind rest easily upon the certainty of guilt." *Allen v. State*, No. M2009–02151–CCA–R3–PC, 2011 WL 1601587, at *11 (Tenn. Crim. App. April 26, 2011).

The injunction at issue in this case enjoined the parties from "making charges or claims of any kind, whether criminal or civil, and from filing suits against the [other party] unless and until she [or he] having first applied in writing to this Court for and received from the Court written permission to do so." Additionally, the parties were required to "comply with and follow all procedures and requirements of the Tennessee Rules of Civil Procedure regarding giving notice to each other, certification of notice, conduct of discovery, and the filing of pleadings and motions." As set out above, Mr. Malmquist introduced court documents or police reports to support all of the allegations of contempt alleged against Ms. Malmquist.[8] While Ms. Malmquist's attorney objected to some testimony at the hearing, Ms. Malmquist put on no witnesses at the hearing, and did not otherwise provide evidence to

---

[8] Ms. Malmquist was not found in contempt for the charge of writing the letter to the DMV calling for an investigation. Neither party appeals this judgment.

contest the fact that she had commenced these actions against Mr. Malmquist without the trial court's prior approval. Instead, Ms. Malmquist argued that the evidence supporting the contempt conviction was fatally deficient on each count.

## A. Federal Cases

Ms. Malmquist first argues that the federal cases were commenced during the pendency of the first contempt petition, and, therefore, were not properly the subject of the second petition. Specifically, because the two federal cases were commenced prior to September 8, 2008, she argues that these cases should not have been included in the present contempt petition, but should have been included in the initial contempt proceeding, which was pending at the time. Ms. Malmquist offers no law to support the assertion that the court could not find her in contempt for these actions, nor have we found any supporting caselaw in our own research. In fact, the criminal contempt statute "confers broad authority upon courts to adjudicate criminal contempt actions arising out of the failure to comply with the court's order even though the obligations arising out of the order are not ongoing." *Cottingham v. Cottingham*, 193 S.W.3d 531, 535 n.3 (Tenn. 2006) (*citing **Storey v. Storey***, 835 S.W.2d 593, 599 (Tenn. Ct. App. 1992) (describing criminal contempt as punishment for the "failure to comply with the prior orders of the court")). As this injunction was still ongoing, the trial court had broad authority to punish a party for violating it at anytime those violations were brought before the court. Accordingly, we conclude that the trial court did not abuse its discretion in finding Ms. Malmquist in contempt beyond a reasonable doubt *vis-a-vis* the federal lawsuits.

## B. Petition for Emergency Injunctive Relief

Ms. Malmquist also argues that, because she non-suited the petition for emergency injunctive relief that was filed in the Davidson County Circuit Court, she cannot be found in violation of the court's order for commencing the action. Upon our review of the September 2006 injunction, we conclude that the injunction enjoined the parties from simply filing suits against the other party, regardless of whether the party was required to appear and defend. We, therefore, conclude that the trial court did not abuse its discretion in finding that Ms. Malmquist's action in filing the petition for emergency injunctive relief violated the court's order beyond a reasonable doubt.

## C. Subpoenas

As to the quashed subpoenas, Ms. Malmquist argues that Mr. Malmquist did not prove, beyond a reasonable doubt, that information obtained pursuant to the quashed subpoenas was used in any other litigation. However, the September 2006 injunction requires

that the parties comply with all Tennessee Rules of Civil Procedure, specifically with regard to giving notice. According to the uncontradicted evidence at the hearing, Mr. Malmquist was never given proper notice of the subpoenas pursuant to Tennessee Rule of Civil Procedure 45.02.[9] Therefore, regardless of Ms. Malmquist's use of the subpoenaed information in other actions, she violated the court's order requiring her to comply with all notice requirements. Accordingly, we affirm the criminal contempt conviction on this count.

### D. Arrest Warrant

Ms. Malmquist also argues that she cannot be held in contempt for swearing out the affidavit against Mr. Malmquist that led to his arrest. Specifically, she argues that, because the arrest warrant was issued based on a probable cause determination by a neutral magistrate, it cannot form the basis for a finding of contempt for violation of the injunction. We disagree. Based on our review of the record, the September 2006 injunction specifically enjoins the parties from "making charges . . . of any kind, whether civil or criminal." Accordingly, we determine the evidence was sufficient to support the contempt conviction on this count.

### E. Notice of Injunction

Finally, Ms. Malmquist argues that she was not on notice that the injunction remained in force due to a notation on the civil docket sheet, stating that the file was "CLOSED." Ms. Malmquist again cites no authority to support her contention. It is well settled that only the court has the power to modify or dissolve an injunction. *See* 43A C.J.S. Injunctions § 369 (2011) ("The power to modify, continue, or dissolve a temporary or permanent injunction, whether preventive or mandatory in character, ordinarily rests in the sound discretion of the trial court . . . ."). In light of the fact that she has previously been found in violation of this same injunction and had been ordered to spend three nights in jail as well as the fact that she had consented to be bound by the injunction, Ms. Malmquist's argument that she had no notice of the injunction is tenuous at best. From the record, we conclude that Ms. Malmquist had sufficient notice of the September 2006 injunction and that the evidence supports the trial court's finding that she willfully violated the injunction beyond a reasonable doubt in the four above counts.

### VI. Conclusion

---

[9] Tennessee Civil Procedure Rule 45.02 requires that "[c]opies of the subpoena must be served pursuant to Rule 5 on all parties, and all material produced must be made available for inspection, copying, testing or sampling by all parties." Ms. Malmquist does not deny that notice was not properly given to Mr. Malmquist.

The decision of the trial court is affirmed. Costs of this appeal are assessed to the Appellant, Danielle Malmquist, and her surety.

_____
J. STEVEN STAFFORD, JUDGE