IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2015

IN RE ESTATE OF HAROLD CURTIS MORRISON

Appeal from the Chancery Court for Rhea County, Probate Division
No. 12PR2111     Ben H. Cantrell, Senior Judge

No. E2014-00764-COA-R3-CV-FILED-MAY 14, 2015

The decedent in this estate action made *inter vivos* transfers of all his real and personal property to the defendant, who was the decedent's friend and caretaker. Following the decedent's death, his brother was appointed as administrator of the decedent's estate. The decedent's brother filed the instant action, questioning whether the transfers of property by the decedent were the result of undue influence by the defendant. The trial court determined that there existed no confidential relationship between the decedent and the defendant. The court ultimately found that no undue influence had been shown. The decedent's brother appeals that determination. He also appeals the trial court's ruling regarding an evidentiary matter and motions seeking the trial judge's recusal. Discerning no error, we affirm the trial court's judgment in all respects.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

James D.R. Roberts, Jr., and Janet L. Layman, Nashville, Tennessee, for the appellants, Estate of Harold Curtis Morrison, by and through its administrator, Leonard Morrison, and Leonard Morrison, individually.

Howard L. Upchurch, Pikeville, Tennessee, for the appellee, Ronnie Jordan.

OPINION

I.  Factual and Procedural Background

The decedent, Harold Curtis Morrison ("Decedent"), died on May 25, 2012, at age seventy. Decedent never married and had no children. At the time of his death,

Decedent was in possession of two large tracts of real property, one of which was given to him by his parents before their deaths, and the other purchased by Decedent with personal funds. Decedent also possessed a significant amount of personalty, including tractors and other farm equipment. On May 29, 2012, Decedent's brother, Leonard Morrison, filed a petition in the Chancery Court for Rhea County, Probate Division, seeking to be appointed as administrator of Decedent's estate and stating that he was Decedent's only next of kin. The trial court entered an order appointing Mr. Morrison administrator of Decedent's estate later that day. Also on that day, Ronnie H. Jordan, Sr., recorded two quitclaim deeds that had been executed by Decedent on August 8, 2011. These deeds transferred title regarding all of Decedent's real property to Mr. Jordan, with Decedent retaining a life estate. Mr. Jordan also recorded an assignment of a deed of trust held by Decedent.

On May 30, 2012, Mr. Jordan filed a claim against Decedent's estate. Mr. Jordan asserted that he was also in possession of a bill of sale that transferred all of Decedent's personal property to Mr. Jordan. On May 31, 2012, Mr. Morrison, acting in his capacity as administrator of Decedent's estate, filed the present action against Mr. Jordan, asserting that the transfers of real and personal property were the result of Mr. Jordan's undue influence upon Decedent. Mr. Morrison sought and was granted an injunction to enjoin Mr. Jordan from selling or conveying the property at issue.

On October 5, 2012, the trial court entered an order *sua sponte*, recusing all judges of the Twelfth Judicial District from adjudicating the case at bar. The Tennessee Supreme Court entered an order appointing Senior Judge Ben H. Cantrell to hear the matter. Mr. Morrison subsequently filed a motion seeking Judge Cantrell's recusal, based on Judge Cantrell's involvement in a prior unrelated matter involving Mr. Morrison's counsel. The motion to recuse was denied.

The trial court conducted a hearing on the merits on November 18 and 19, 2013. At the outset of trial, the court permitted Mr. Morrison to be added as a party plaintiff in his individual capacity. The trial court then considered testimony from numerous witnesses, including Mr. Morrison, several of Decedent's friends and neighbors, and Decedent's former attorney, who had prepared the deeds, assignment, and bill of sale in question. Decedent's treating physician and another of Decedent's former attorneys provided proof via depositions.

The witnesses all testified that Decedent had labored on the farm for most of his life and that he continued to do so until his physical health began to decline a few years preceding his death. Decedent was described as independent and industrious, single-handedly maintaining both the farm he acquired from his parents and the farm he purchased. Decedent's health began to decline six to seven years before his death when

Decedent noticeably suffered from leg and knee problems and experienced trouble with his heart. Mr. Jordan moved into a small residence on Decedent's property in approximately 2005. Mr. Jordan assisted Decedent on the farm, also assuming the role of personal caretaker for Decedent during the months prior to Decedent's death. Despite Decedent's failing health, the witnesses appeared to generally agree that his mental status showed no deterioration. The only exceptions included: (1) the testimony of one witness who related that Decedent had difficulty in August 2010 operating an electronic voting machine, although Decedent knew for whom he wished to vote; and (2) the testimony of another witness who described Decedent as seeming overmedicated during a visit in February 2012, three months before Decedent's death. Mr. Morrison also testified that on a few occasions when he spoke to Decedent by telephone in the months preceding his death, Decedent mumbled and sounded overmedicated.

All of the witnesses, however, agreed that Decedent was stubborn, headstrong, and opinionated. They further indicated that although Decedent came to depend upon Mr. Jordan's help in the months before his death, the two men maintained a good relationship. They also explained that Decedent never complained that Mr. Jordan was trying to influence him in any way. Mr. Morrison admitted during his testimony that "if [Decedent] didn't want to do it, he wasn't going to do it." Mr. Morrison claimed that he and his brother enjoyed a good relationship, but he acknowledged that Decedent had once paid a tax bill on Mr. Morrison's behalf in the amount of $16,000, which Mr. Morrison asserted he repaid with cash and cattle. Mr. Morrison also admitted that he did not personally provide care for Decedent, run errands for him, or take him to the doctor, leaving those responsibilities instead to Mr. Jordan.

Decedent's treating physician, Dr. Christopher Horton, testified that Decedent became his patient about six years prior to Decedent's death. According to Dr. Horton, while Decedent's physical health deteriorated during that time, his mental status did not. Dr. Horton reported that although Decedent was prescribed narcotic medication in later years for chronic leg pain, he did not believe that Decedent abused this medication. According to Dr. Horton, when he saw Decedent in the office on August 3 and 9, 2011, there was nothing concerning Decedent's mental state that would suggest change or deterioration. Dr. Horton also testified that Decedent never appeared under someone else's influence, adding that Decedent demonstrated nothing to cause Dr. Horton to conclude that Decedent was susceptible to the influence of others.

Decedent's former attorney, Arnold Fitzgerald, testified at trial, explaining that he had known Decedent and Mr. Morrison since 1954. Mr. Fitzgerald stated that Decedent initially came alone to his office in 2011, seeking preparation of the documents transferring all of his real and personal property to Mr. Jordan. According to Mr. Fitzgerald, Decedent wished to transfer his real property by deed because he did not want

3

to have a will that Mr. Morrison could contest. Mr. Fitzgerald further related that Decedent indicated that "he didn't want to leave even his last pair of dirty socks for Leonard Morrison." Concerning the matter, Mr. Fitzgerald testified that he prepared the documents according to Decedent's directions. Decedent traveled to Mr. Fitzgerald's office a second occasion to discuss further the documents before appearing on a third occasion to sign them. Mr. Fitzgerald related that he met with Decedent alone for a total of approximately two hours during the first two visits, at which times Decedent informed Mr. Fitzgerald that he did not desire to leave anything to Mr. Morrison because Mr. Morrison only came around when he wanted money. Decedent also reported to Mr. Fitzgerald that Mr. Morrison had borrowed money from him and never repaid it.

Mr. Fitzgerald opined that during their conferences, Decedent was lucid, clear-thinking, and knew exactly how he wished to dispose of his property. As Mr. Fitzgerald explained, although the three meetings spanned a period of several weeks, Decedent's mental status and his expressed wishes never changed. According to Mr. Fitzgerald, Decedent was strong-willed and seemed very cognizant of the nature of the meetings. Mr. Fitzgerald reported that he never observed anything leading him to believe that Decedent was incompetent or being influenced by anyone.

Two of Decedent's close friends, Henry and Janet Pickett, corroborated Mr. Fitzgerald's testimony regarding Decedent's intentions. The Picketts testified that Decedent was upset because Mr. Morrison owed him money that had never been repaid and only came around if he wanted something. The Picketts further related that Decedent did not wish to leave any of his property to his brother. As further explained by the Picketts, Mr. Jordan transported Decedent anywhere he desired, including numerous doctors' appointments. The two men appeared to be good friends. According to the Picketts, Mr. Jordan seemed to provide excellent care for Decedent. The Picketts also testified that while they saw Decedent regularly during the last twelve to thirteen years of his life, they never observed any mental change or degradation. The Picketts also described Decedent as strong-willed, independent, and not easily influenced.

At the conclusion of trial, the court entered a memorandum opinion and order specifically finding that there existed no confidential relationship between Decedent and Mr. Jordan, as would be required in order to establish undue influence. The court stated in pertinent part:

> The proof in this case falls far short of establishing a confidential relationship between [Decedent] and Ronnie Jordan. All the proof shows that [Decedent] retained his independent personality until the end of his life. To conclude that anyone possessed the ability to persuade him to do something he didn't like would be against the vast weight of the evidence.

4

In addition, even if a confidential relationship existed, the dominant party can receive benefits from the weaker party by showing that the relationship was not abused and that the weaker party received independent advice. *Williamson v. Upchurch*, 768 S.W.2d 265 (Tenn. Ct. App. 1988). In this case, [Decedent] did receive independent advice and there is no proof that Mr. Jordan abused his relationship with [Decedent]. We come back to the fact that [Decedent] made his own decisions and used his property as he pleased. His lawyer testified that he wished to use the deeds rather than a will because "a will can always be changed."

Accordingly, the trial court dismissed Mr. Morrison's action against Mr. Jordan, with the exception of awarding Mr. Morrison possession of his personal property located on Decedent's farm.

Following the court's ruling, Mr. Morrison filed several motions, including a motion to alter or amend pursuant to Tennessee Rule of Civil Procedure 59.04 and a renewed motion seeking recusal of the trial judge. The trial court denied Mr. Morrison's post-trial motions. While Mr. Morrison timely appealed, he thereafter filed a second renewed motion for recusal, which the trial court likewise denied.

## II. Issues Presented

Mr. Morrison presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred in finding that no confidential relationship existed between Decedent and Mr. Jordan.

2. Whether the trial court erred in its findings of fact based upon the record and testimony at trial.

3. Whether the trial court erred in considering Mr. Fitzgerald's testimony.

4. Whether the trial judge erred in refusing to grant a recusal.

## III. Standard of Review

In this non-jury case, our review is *de novo* upon the record of the proceedings below; however, that record comes to us with a presumption that the trial court's factual findings are correct. *See* Tenn. R. App. P. 13(d). We must honor this presumption unless

we find that the evidence preponderates against the trial court's findings.  *See Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  We review questions of law *de novo* with no presumption of correctness.  *See* Tenn. R. App. P. 13(d).

We further note that "trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility.  Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations."  *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (internal citations omitted).  As such, findings of the trial court regarding the credibility of witnesses and the weight to be given their testimony are entitled to great deference on appeal.  *See Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991).

## IV.  Confidential Relationship and Undue Influence

Mr. Morrison asserts that the trial court erred in determining that no confidential relationship existed between Decedent and Mr. Jordan.  The issue of whether such a confidential relationship existed is a question of fact.  *See In re Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008).  This Court has previously elucidated:

> Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is.  *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974).  In general terms, it is any relationship that gives one person the ability to exercise dominion and control over another.  *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002); *Childress v. Currie*, 74 S.W.3d at 328; *Mitchell v. Smith*, 779 S.W.2d at 389.  It is not merely a relationship of mutual trust and confidence, but rather it is one
>
>> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.
>
> *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).
>
> Fiduciary relationships are confidential per se because of the legal status of the parties.  They automatically give rise to a presumption of undue influence with regard to transactions that benefit the fiduciary.  Examples of such fiduciary relationships include that between guardian and

6

ward, attorney and client, or conservator and incompetent. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell v. Smith*, 779 S.W.2d at 389; *Parham v. Walker*, 568 S.W.2d 622, 625 (Tenn. Ct. App. 1978). Relationships not fiduciary in nature, even those that are inherently confidential, such as those between family members, are not confidential per se and require proof of the elements of dominion and control in order to establish the existence of a confidential relationship. *Matlock v. Simpson*, 902 S.W.2d at 385-86; *Kelly v. Allen*, 558 S.W.2d at 848.

*Kelley v. Johns*, 96 S.W.3d 189, 197-98 (Tenn. Ct. App. 2002). Further, the burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship, which in this case would be Mr. Morrison. *See Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). As this Court has explained:

> A confidential relationship in this context is not merely a relationship of mutual trust and confidence, but rather a relationship in which confidence is placed in one who is the dominant personality in the relationship, with the ability, because of that confidence, to exercise dominion and control over the weaker or dominated party. *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).
>
>> [T]here must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, or other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor.

*Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977) (emphasis added). Evidence of one party's deteriorated mental or physical condition will substantiate the existence of a confidential relationship if the condition renders the weaker party unable to guard against the dominant party's imposition or undue influence. *Williamson v. Upchurch*, 768 S.W.2d 265, 270 (Tenn. Ct. App. 1988). Still, "[t]he core definition of a confidential relationship requires proof of dominion and control," and the question of whether undue influence existed should be decided by the application of sound principles and good sense to the facts of each case. *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002). In undue influence cases, the question for us "is not whether the weaker party's decision was a good one, or even whether he knew what he was doing at the time." *Williamson v.*

*Upchurch*, 768 S.W.2d at 270. Instead, we must determine "whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party." *Id.*

*In re Estate of Reynolds*, No. W2006-01076-COA-R3-CV, 2007 WL 2597623 at *8 (Tenn. Ct. App. Sept. 11, 2007).

In this case, it is undisputed that there was no fiduciary relationship between Decedent and Mr. Jordan. *See Kelley*, 96 S.W.3d at 197-98. Further, upon our thorough review, the record demonstrates that there was no proof that Mr. Jordan exercised dominion or control over Decedent. According to the preponderance of the evidence, Decedent was the dominant personality in this relationship, not Mr. Jordan. Further, Decedent showed no signs of mental deterioration or susceptibility to influence. The witnesses, including Mr. Morrison, agreed that Decedent was strong-willed and independent, continuing as such until his death. Ergo, there was a dearth of evidence that Mr. Jordan's will was or could have been substituted for that of Decedent. Rather, the weight of the testimony indicated that Decedent's decisions regarding his property were free and independent ones. We conclude that the evidence does not preponderate against the trial court's finding that no confidential relationship existed between Decedent and Mr. Jordan. Because a claim of undue influence is dependent upon the existence of a confidential relationship, s*ee Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995), Mr. Morrison cannot meet the burden of proof regarding his claim of undue influence. The trial court did not err in dismissing this claim.

We further note that Mr. Morrison's second issue, questioning whether the trial court made erroneous findings of fact in its analysis of the confidential relationship issue, is disposed of by our determination regarding the preponderance of the evidence. Based upon our thorough review of the record, we conclude that the evidence preponderates in favor of the trial court's factual findings. Accordingly, Mr. Morrison's first two issues are determined to be without merit.

## V. Testimony of Attorney Fitzgerald

Mr. Morrison asserts that the trial court erred in allowing Mr. Fitzgerald to testify regarding what he was told by Decedent because (1) such testimony is hearsay and (2) such testimony violates the Rules of Professional Conduct with regard to client confidentiality. We note at the outset that "admissibility or exclusion of evidence rests within the sound discretion of the trial court, which should be reversed only for abuse of that discretion." *Austin v. City of Memphis*, 684 S.W.2d 624, 634 (Tenn. Ct. App. 1984). "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly

8

erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

At trial, Mr. Morrison's counsel objected to Mr. Fitzgerald's testimony regarding his conversations with Decedent prior to Decedent's execution of the documents in question. Counsel asserted that Decedent's statements constituted inadmissible hearsay. The trial court disagreed and overruled the objection. We find no abuse of discretion in the trial court's ruling regarding this evidence.

Tennessee Rule of Evidence 803 establishes certain exceptions to the hearsay rule. Specifically, Tennessee Rule of Evidence 803(3) provides an exception for:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), . . . .

The Advisory Commission Comments to the Rule provide that "declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state."

In the case at bar, Mr. Fitzgerald testified as to statements made by Decedent regarding why he desired to have certain documents drafted transferring his property to Mr. Jordan. Such statements included: (1) Decedent did not want a will because such a testamentary instrument could be contested; (2) Decedent was upset that his brother did not repay him the tax obligation that Decedent paid on his brother's behalf; (3) Decedent did not wish for any of his property to go to his brother; and (4) Decedent desired Mr. Jordan to have all of his property. These statements were offered to demonstrate Decedent's intent in executing the documents in question.

We conclude that these statements constitute an exception to the hearsay rule because they are statements of Decedent's then existing state of mind pursuant to Tennessee Rule of Evidence 803(3). As this Court recognized in *Martindale v. Union Planters Nat'l Bank*, No. 02A01-9502-CH-00030, 1996 WL 266650 at \*2 (Tenn. Ct. App. May 21, 1996), "[t]his exception has long been recognized as a means through which to admit into evidence a declarant's state of mind in order to prove subsequent conduct that is consistent with that mental state." *See also In re Estate of Nelson*, No. W2006-00030-COA-R3-CV, 2007 WL 851265 at \*13 (Tenn. Ct. App. Mar. 22, 2007) (holding that a bank officer's testimony regarding statements made by the decedent when purchasing certificates of deposit was admissible pursuant to Tennessee Rule of Evidence 803(3)); *Storey v. Tolson*, No. 1414, 1991 WL 102683 at \*3 (Tenn. Ct. App. June 17, 1991) (holding that the state of mind exception could have been applied to allow the

decedent's daughter to testify regarding what the decedent said at the time he changed the ownership of his bank accounts); *Gray v. Gray*, No. 03A01-9101-CV-00003, 1991 WL 51399 at *2 (Tenn. Ct. App. Apr. 11, 1991) (holding that an insurance agent's testimony regarding statements made by the decedent when naming beneficiaries for his life insurance policy was admissible pursuant to Tennessee Rule of Evidence 803(3)). We therefore conclude that the trial court properly ruled that this testimony did not constitute inadmissible hearsay.

Mr. Morrison also contends that Mr. Fitzgerald's testimony should have been disallowed because it violated the Rules of Professional Conduct with regard to client confidentiality. Specifically, Rule of Professional Conduct 1.9 (c) provides:

> A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter reveal information relating to the representation or use such information to the disadvantage of the former client unless (1) the former client gives informed consent, confirmed in writing, or (2) these Rules would permit or require the lawyer to do so with respect to a client, or (3) the information has become generally known.

Tenn. R. Sup. Ct. Rule 8, RPC 1.9. In this case, Mr. Fitzgerald did not utilize the information he gained from the Decedent to the Decedent's disadvantage; rather, he disclosed the information in order to ensure that Decedent's wishes regarding transfer of his property were fulfilled. Further, the evidence demonstrated that Decedent had disclosed this same information to other individuals as well.

This case is similar to *Estate of Hamilton v. Morris*, 67 S.W.3d 786 (Tenn. Ct. App. 2001), wherein the decedent executed a will in 1987 and then executed a substantially different will five years later. The devisees under the earlier will claimed that the more recent will was the result of undue influence, and the attorney who drafted the more recent will was asked to testify regarding its origin. *Id.* Concerning the issue of attorney-client privilege, this Court explained:

> [M]ost courts presume that the privilege survives the death of the client, but they view testamentary disclosure of communications as an exception to the privilege. *Id.* The *Swidler* Court quoted from *United States v. Osborn*, 561 F.2d 1334, 1340 (9th Cir. 1977):
>
>> [T]he general rule with respect to confidential communications . . . is that such communications are privileged during the testator's lifetime and, also, after the

10

testator's death unless sought to be disclosed in litigation between the testator's heirs . . . .

524 U.S. at 405, 118 S.Ct. 2081 (citations omitted). The Court went on to say that, "The rationale for such disclosure is that it furthers the client's intent." *Id.*

The parties have not cited, nor has our research revealed, a Tennessee case dealing with the precise point before us. However, although "the privilege accorded certain communications between . . . attorney and client, has been long and frequently upheld by the Courts of this State, it has also been frequently recognized that there are many exceptions to this privilege." *Hazlett v. Bryant*, 192 Tenn. 251, 241 S.W.2d 121, 123 (1951).

In *Glover v. Patten*, 165 U.S. 394, 17 S.Ct. 411, 41 L.Ed. 760 (1897), a case which has not been overruled in over one-hundred years, the United States Supreme Court set out what we believe is the applicable rule in the case at bar:

> . . . we are of the opinion that, in a suit between the devisees under a will, **statements made by the deceased to counsel respecting the execution of the will, or other similar document, are not privileged.** While such communications might be privileged if offered by third persons to establish claims against an estate, they are not within the reason of the rule requiring their exclusion, **when the contest is between the heirs or next of kin.**

165 U.S. at 406, 17 S.Ct. 411 (emphasis added).

81 Am.Jur.2d *Witnesses* § 389 states:

**Factors affecting applicability; client's death**

Where the client is dead and the controversy arises concerning the validity of the deceased client's will, or between the claimants thereunder, no privilege exists as to communications between the testator and his attorney concerning the drafting of a will. Thus, communications by a client to the attorney who drafted his will, concerning the will

11

and transactions leading to its execution, generally are not, after the client's death, protected as privileged communications in a suit between the testator's heirs, devisees, or other parties who claim under him, although there is authority for the proposition that the privilege protecting a client's communications to the attorney who drew his will may be invoked against claimants adverse to the interests of the client, his estate, or his successors.

Appellants assert that this is an "inter-dispute" between heirs and/or devisees versus non-heirs and/or non-devisees, and that, therefore, the attorney-client privilege is not waived. We must disagree. The allowance of the exception is to help establish the intent of the testatrix or testator, and we can see no reason for a distinction made by Appellants as to the disputes between those designated as heirs, devisees, non-heirs, or non-devisees. The testamentary exception should be applied to such disputes concerning all potential beneficiaries.

*Estate of Hamilton*, 67 S.W.3d at 791-792 (all emphasis in original).

Although the case at bar does not involve a testamentary instrument, we find the reasoning in *Estate of Hamilton* to be equally applicable here inasmuch as the controversy involves two potential beneficiaries of Decedent's property. Mr. Fitzgerald presented testimony concerning Decedent's intent in executing the documents at issue in order to substantiate Decedent's desires regarding his property rather than attack the validity of the documents or otherwise thwart the Decedent's wishes. For all of the above reasons, we conclude that the trial court did not err in allowing Mr. Fitzgerald's testimony to be admitted in this matter.

## VI. Recusal

During the course of litigation, Mr. Morrison filed three separate motions seeking recusal of the trial judge. Each motion was premised on the trial judge's alleged bias against Mr. Morrison's counsel, Mr. Roberts. According to the motions, Judge Cantrell had previously been appointed to hear the appeal of an action between Mr. Roberts and the Board of Professional Responsibility, despite the fact that Judge Cantrell had formerly served as a mediator in a related matter. Mr. Roberts filed a motion seeking Judge Cantrell's recusal in that earlier action, based on Judge Cantrell's prior status as a mediator in the related matter and the fact that Judge Cantrell's residency violated the residency requirements of Tenn. R. Sup. Ct. 9, §1.5. While Judge Cantrell denied the recusal motion, the Supreme Court disagreed and appointed another judge to hear the

appeal. Mr. Morrison thus questioned Judge Cantrell's ability to be impartial in this action regarding Mr. Roberts given this history of events and separate litigation.

The trial court denied the initial motion for recusal, stating in pertinent part:

Neither ground for recusal in the other case involved any personal bias or prejudice toward the attorney. Thus, this motion is based on an assumption that the court would be prejudiced toward the Administrator's attorney because he got the Supreme Court to reverse the order denying the motion to recuse in the other case.

No ordinarily prudent person knowing the true facts would conclude that an experienced judge would be so incensed over a reversal that he or she could not be fair and impartial in another case involving that attorney. This Court harbors no such animosity, having been through this experience more than once before.

The Court finds that the motion is not well taken. It is therefore, ORDERED that the motion is DENIED.

Mr. Morrison subsequently filed two similar motions to recuse following the trial, both of which were denied. Mr. Morrison contends that the trial court erred in denying his motions for recusal. We review the trial court's disposition of a motion for recusal under a *de novo* standard of review. *See* Tenn. Sup. Ct. R. 10B § 2.06 (effective as to disposition of motions for recusal filed on or after July 1, 2012). As our Supreme Court has explained:

Tennessee Supreme Court Rule 10, Canon 3(E)(1) states, "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer . . . ."[1] We have held that a recusal motion should be granted when "the judge has any doubt as to his or her ability to preside impartially in the case" or "'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Davis* [*v. Liberty Mut. Ins. Co.*], 38 S.W.3d [560,] 564-65 [(Tenn. 2001)] (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)). Even if a judge believes he can be fair and impartial, the judge should disqualify

---

[1] Effective July 1, 2012, this provision is contained within Tenn. Sup. Ct. R. 10, Canon 2.11(A)(1).

himself when "'the judge's impartiality might be reasonably questioned'" because "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Id.* (quoting Tenn. Sup. Ct. R. 10, Canon 3(E)(1)).

*Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009); *see also Malmquist v. Malmquist*, 415 S.W.3d 826, 838-39 (Tenn. Ct. App. 2011). "Adverse rulings and 'the mere fact that a witness takes offense at the court's assessment of the witness,' do not provide grounds for recusal, however, in light of the 'adversarial nature of litigation.'" *Watson v. City of Jackson*, 448 S.W.3d 919, 2014 WL 575915 at *9 (Tenn. Ct. App. 2014) (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001)).

Upon our careful and thorough review of the record, including the transcript of the trial conducted in this matter, we discern no indication of prejudice expressed or implied by the judge. *See, e.g., Watson*, 448 S.W.3d 919, 2014 WL 575915 at *13 ("Although we are cognizant of the fact that the trial judge declined to grant any of [the appellant's] *pro se* post-trial motions, it is well-settled that '[a]dverse rulings by a trial judge . . . are not usually sufficient to establish bias.'" (quoting *Ingram v. Sohr*, No. M2012-00782-COA-R3-CV, 2013 WL 3968155 at *31 (Tenn. Ct. App. July 31, 2013)); *Malmquist*, 415 S.W.3d at 840 ("The fact that [the trial court judge] helmed this litigation, without apparent bias, even in the face of difficult litigants and protracted litigation, supports his discretionary decision to remain on the case to see it concluded."). The trial court did not err by denying Mr. Morrison's motions for recusal.

## VII. Motion to Strike

Following the submission of his principal brief, Mr. Morrison filed a "Notice of Filing" with this Court and attached a copy of a complaint he filed against Mr. Fitzgerald on October 29, 2014. In response, Mr. Jordan filed a motion requesting that this notice and attached complaint be stricken. The respective motion was deferred to this panel for decision. Mr. Morrison's filing essentially asks this Court to consider post-judgment facts that are not a part of the appellate record in this case.

In *Duncan v. Duncan*, 672 S.W.2d 765, 767 (Tenn. 1984), our Supreme Court explained that when analyzing whether to consider post-judgment facts in accordance with Tennessee Rule of Appellate Procedure 14, this Court should not consider "evidence which it would be possible to controvert or dispute in the trial court, nor concerning the effect of which there might be differences of opinion, or from which different conclusions could possibly be drawn." Because the complaint submitted does not contain facts capable of ready demonstration, but rather contains facts that would be able to be disputed at the trial court level, we hereby grant the motion to strike this filing.

## VIII. Conclusion

For the reasons stated above, we affirm the trial court's judgment and remand the case to the trial court for enforcement of said judgment and collection of costs assessed below. Costs on appeal are taxed to the appellants, Estate of Harold Curtis Morrison, by and through its administrator, Leonard Morrison, and Leonard Morrison, individually.


_____
THOMAS R. FRIERSON, II, JUDGE